FILED
United States Court of Appeals
Tenth Circuit

October 15, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

IREANE KELLOGG,

               Plaintiff - Appellee,

v.

ENERGY SAFETY SERVICES INC.,
an Arizona corporation, doing
business as, Oilind Safety LLC,

               Defendant - Appellant.

No. 07-8072

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 06-CV-110-CAB)**

---

Catherine MacPherson, Of Counsel, (Thomas A. Thompson, with her on the brief), of MacPherson, Kelly & Thompson, LLC, Rawlins, Wyoming, for Defendant - Appellant.

Bruce S. Asay (Meredith F. Asay with him on the brief), of Associated Legal Group, LLC, Cheyenne, Wyoming, for Plaintiff - Appellee.

---

Before **HARTZ**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

    Ireane Kellogg sued her former employer, Oilind Safety, under the

Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 et. seq., and the Fair

Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. She claimed that Oilind (1) discriminated against her in violation of the ADA by firing her after she was diagnosed with epilepsy, and (2) denied her overtime payments to which she was entitled under the FLSA. The jury found for her on both claims and awarded her damages. In addition, the district court awarded Ms. Kellogg prejudgment interest, front pay under the ADA, liquidated damages under the FLSA, and attorney fees. Oilind appeals. With respect to the ADA claim, it argues that the jury improperly found that Ms. Kellogg was a qualified individual who was substantially limited in a major life activity because (1) the court erred in instructing the jury that driving is a major life activity, (2) Ms. Kellogg failed to prove that she was disabled within the meaning of the ADA, and (3) Ms. Kellogg failed to prove that she was a qualified individual who could perform the essential functions of her job, with or without reasonable accommodation. It also argues (4) that the court abused its discretion in awarding front pay under the ADA. As for the FLSA claim, Oilind argues (5) that the evidence was insufficient to support the jury's verdict and (6) that the court erred in granting Ms. Kellogg liquidated damages. Although we reject Oilind's other contentions regarding the ADA claim, we agree that the jury was erroneously instructed that driving is a major life activity under the ADA. We therefore remand for a new trial on the ADA claim. We affirm the jury's verdict on the FLSA claim and hold that there was no abuse of discretion in the award of liquidated damages.

## I.    BACKGROUND

Oilind hired Ms. Kellogg as a safety technician in Worland, Wyoming, in June 2004. Oilind is an industrial safety company that provides safety-related services, such as training and environmental monitoring, to industrial customers. It also rents, sells, and services safety equipment, such as gas monitors and air packs. Oilind operates 16 offices in 10 states and during 2004–2005 employed approximately 150 people. The Worland office is one of Oilind's four oilfield offices. At the time of trial, nine employees worked in the Worland office.

As part of Ms. Kellogg's job as a safety technician—and as a safety supervisor, to which she was later promoted—she traveled to oilfields to provide services to clients. Ms. Kellogg also occasionally worked "in the shop" in Worland, where she maintained and repaired breathing equipment and cylinders of compressed air. When Ms. Kellogg worked in the field, she would pick up a company vehicle from the shop in Worland and drive as much as two hours to the work site, where she would typically work a 12-hour shift before leaving to drive back to Worland. Ms. Kellogg was paid as a salaried employee at the rate of $1700 a month, until she received a raise to $1825 per month in December 2004. In addition, she received "field bonuses" based on Oilind's billings to customers. Although the job posting described the job as 40 hours per week, it is undisputed that Ms. Kellogg sometimes worked more than 40 hours a week. She testified that in her busiest month she worked 180 hours above a 40-hour-per-week pace.

On January 20, 2005, Ms. Kellogg missed a day of work. The next day, when her coworkers asked where she had been, she had no recollection of the day before and had not realized that she had missed a day. She was seen that day by a doctor, who told her that she could not return to work until cleared by him. Two days later, after losing consciousness at home, Ms. Kellogg was hospitalized and diagnosed with complex partial seizures, a form of epilepsy. On January 31 her doctor issued her a note allowing her to return to work, but not to drive until he saw her again.

Some time in early February, Ms. Kellogg took her doctor's note to the Worland office and asked to work in the shop. The Wyoming district manager for Oilind, Aaron Chamberlain, wanted to put her to work in the shop because they were shorthanded and could not handle the workload, but he first had to check with corporate headquarters. Ms. Kellogg returned to the shop every week to check on her job; on one visit to the shop, Chamberlain told her that the corporate office considered her a "liability." Aplt. App., Vol. III at 463. In a letter dated May 5, 2005, Oilind informed Ms. Kellogg that it was "not able to employ [her] in a safety-sensitive position," which it declared hers to be, without a "full release" from her doctor. *Id.* Vol. VII at 1213. Without such a release, it would remove her from the payroll. Ms. Kellogg never provided Oilind with a release allowing her to drive.

-4-

Ms. Kellogg brought suit against Oilind under the ADA, alleging disability discrimination, and under the FLSA, alleging that she was entitled to overtime compensation. After an eight-day trial, the jury found for Ms. Kellogg on both claims. On her ADA claim it awarded her $125,000 in compensatory damages (reduced by the district court to the statutory maximum of $100,000), and $46,935 in past wages; and it awarded $12,500 in overtime wages under the FLSA. The district court additionally awarded Ms. Kellogg $18,087 in front pay under the ADA, $12,500 in liquidated damages under the FLSA, $2,347 in prejudgment interest, and $147,888 in attorney fees under both the ADA and FLSA.

## II.    DISCUSSION

### A.    ADA Claim

The ADA prohibits employment discrimination against any "qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a).

> A prima facie case of ADA discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.

*Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007). Only the first and second elements are at issue on appeal.

### 1.    Disability: Driving as a Major Life Activity

The first element of a discrimination claim under the ADA is proof that the plaintiff has a qualifying "disability" under the statute. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2). The term "major life activities" is not defined in the statute, but a regulation promulgated by the Equal Employment Opportunity Commission[1] defines it as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

The categorization of an activity as a "major life activity" is crucial to the determination of disability. Oilind argues that the jury's verdict must be vacated because the jury was erroneously instructed that driving constitutes a major life activity under the ADA. The district court first expressed its view in an order partially granting and partially denying a motion for summary judgment by Oilind:

> This Court believes that there is no question that in Wyoming, where public transportation is virtually non-existent, distances between towns is measured by hours of driving, economic conditions often require residents to seek employment outside of their local

---

[1]The Supreme Court has not determined what level of deference should be given to the EEOC regulation, because no agency has been granted authority to issue regulations implementing the generally applicable provisions of the ADA, which include the definition of disability. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 479 (1999). Neither party in this case has questioned the validity of the regulation.

community, and long winter conditions significantly limit foot or bicycle travel, driving is clearly a major life activity. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 19[7] [(]2002) (finding that "major life activities" refers to those activities that are of central importance to daily life).

Aplt. App., Vol. I at 33. Oilind objected at trial to the instructions that included driving as a major life activity, but the objection was overruled.

"The interpretation of a federal statute is a question of law which this court reviews *de novo*." *Scanlon White, Inc. v. Comm'r*, 472 F.3d 1173, 1175 (10th Cir. 2006). Whether driving constitutes a "major life activity" under the ADA is a question of first impression in this circuit. The two courts of appeals that have published opinions on the question have concluded that it is not. *See Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2nd Cir. 1998); *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329–30 (11th Cir. 2001). Although driving is not one of the listed activities in the EEOC regulation, that does not end the inquiry because the regulation does not purport to give an exhaustive list.

It cannot be disputed that driving is an extremely important daily activity to many, even most, adults. Without the ability to drive, it may be very difficult to care for oneself or to work. Indeed, we have recognized that the activity of "[c]aring for one's self encompasses normal activities of daily living; including . . . driving . . . ." *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 767 (10th Cir. 2006) (internal quotation marks omitted). But driving is, literally, a means to an end. The activities enumerated by the EEOC—"caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"—are all profoundly more important in and of themselves than is driving. There are those who drive just for the pleasure of it ("Hey, let's go for a ride"), but that practice is declining and some would now consider it unpatriotic. Moreover, the importance of the enumerated activities is not dependent on where one lives; they are valued as much by the resident of a major metropolitan area as by an isolated rural resident. Driving, in contrast, may be a minor concern for one who is near convenient mass transit and can walk to work.

To conclude, as did the district court, that driving is a major life activity because of its importance to the performance of other major life activities, such as caring for oneself or working, would shortcircuit the analysis in determining whether one of those major life activities has been substantially limited. For instance, to show a substantial limitation in the major life activity of working, the plaintiff must, under the EEOC regulations, establish a "significant[] restrict[ion] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Undoubtedly, an inability to drive will sometimes enable the plaintiff to meet this standard. *See Best v. Shell Oil Co.*, 107 F.3d 544, 548 (7th Cir. 1997). Likewise, a restriction on driving could cause one to be substantially limited in the activity of caring for oneself. But a plaintiff

should not be permitted to bypass having to prove substantial limitations in these major life activities by providing only evidence that she cannot drive.

We hold that driving is not itself a major life activity. Because the jury was not required to indicate on the verdict form which major life activity or activities it found to be substantially limited, it is impossible to know whether the jury based its verdict on just the legally incorrect ground that Ms. Kellogg was unable to drive. When an appellate court cannot determine whether a jury reached its verdict on an incorrect legal theory presented in the instructions, it must set aside the verdict. *See Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1298–1301 (10th. Cir. 1989). We therefore vacate the verdict on Ms. Kellogg's ADA claim.

### 2. Sufficiency of the Evidence

Oilind urges us to go further than merely setting aside the verdict. It argues that it is entitled to entry of judgment in its favor on the ADA claim because there was insufficient evidence to support the jury's verdict even on the theories of relief for which the instructions were correct. It contends that the evidence was insufficient to support two propositions necessary for the verdict: (1) that Ms. Kellogg was a person with a "disability" and (2) that she was a "qualified individual." Oilind moved on these grounds for judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50(a) and (b); and the district court denied the motions. We review this denial de novo. *Kelly v. Metallics West, Inc.*, 410 F.3d 670, 674 (10th Cir. 2005).

[A JMOL] is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.  We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for those of the jury.  However, we must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law.  We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party.

*McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006) (internal quotation marks omitted).  For the reasons that follow, we agree with the district court on these issues.

### a.    Disability

Oilind argues that Ms. Kellogg did not establish that she is a person with a disability as defined by the ADA because she did not show that she had an impairment that substantially limited her in the major life activities of working or caring for herself.  Establishing the existence of such an impairment, however, is only one of three ways to prove a "disability" under the ADA.  A plaintiff may also show that she had "a record of such an impairment," 42 U.S.C. § 12102(2)(B), or that she was "regarded as having such an impairment," *id*. § 12102(2)(C).  Ms. Kellogg pursued at trial the theory that Oilind "regarded" her as having an impairment that substantially limited at least one of her major life activities.  Yet Oilind has not addressed on appeal that potential ground for finding Ms. Kellogg disabled.  Because Oilind has not argued, much less demonstrated, that the evidence at trial would not support a jury finding that Oilind regarded Ms. Kellogg

-10-

as having an impairment that substantially limited one of her major life activities, we may assume that the evidence did support such a finding, so denial of JMOL was correct. *See Lindstrom v. United States*, 510 F.3d 1191, 1196 (10th Cir. 2007) (arguments not raised in appellant's brief are waived).

### b.    Qualification

The second element of an ADA discrimination claim is proving that the plaintiff is a "qualified individual with a disability." *See Zwygart*, 483 F.3d at 1090. As we explained in *Tate v. Farmland Industries, Inc.*, 268 F.3d 989 (10th Cir. 2001):

> The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As a condition to performing the essential functions of an employment position, however, an individual must first satisfy "the requisite skill, experience, education and other job-related requirements of the employment position." 29 C.F.R. § 1630.2(m). If a plaintiff fails to establish that he has met either step of this analysis, he is not a "qualified individual" within the meaning of § 12111(8).

*Id.* at 992–93 (footnote omitted).

There is no dispute that Ms. Kellogg was qualified to do her job before she was diagnosed with epilepsy. At trial Oilind claimed that there were two job requirements that Ms. Kellogg could no longer meet after her diagnosis: (1) she could not drive, and (2) she could not meet the standards in DOT "pipeline regulations" to perform "safety-sensitive" work in the shop. Aplt. App., Vol. IV at

709. In *Tate* we discussed when an employer's stated requirement for a job should be considered an essential function of the job:

> The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement. *Cf. Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (holding under the ADA that an essential function of a job must be actually required of all employees in the particular position). This inquiry is not intended to second guess the employer or to require the employer to lower company standards. *Id.*; *see also* H. Rep. No. 101-485(II), at 55 (1990), *reprinted* in 1990 U.S.C.C.A.N. 303, 337 (The ADA "does not undermine an employer's ability to choose and maintain qualified workers."). Provided that any necessary job specification is job-related, uniformly-enforced, and consistent with business necessity, the employer has the right to establish what a job is and what is required to perform it.

268 F.3d at 993.

Applying these tests, we conclude that the jury could properly have found that neither of Oilind's claimed job requirements was an essential function of Ms. Kellogg's job. As to the first, the jury could find that driving was not an essential function of the job, because there was testimony that at least twice in the past, the Worland office had allowed safety supervisors who had lost their driving privileges after driving-under-the-influence infractions to work in the shop until their licenses were restored. As to the second, the jury could find that the ability to meet DOT "pipeline regulations"—which allegedly prohibited anyone on a medication from working in a "safety-sensitive" position—was not a requirement of the job, given that these regulations were never produced for the jury and no

-12-

witness from the company was able to give more than a vague description of them. Chamberlain, the district manager, said that he had been unaware of any regulations prohibiting Ms. Kellogg from working in the shop until the corporate office told him so.  When the company's president was asked about the pipeline regulations, he testified that he was familiar with the ones applicable to Oilind, but he did not identify any of them.  He claimed that the medical restrictions for safety-sensitive positions were also contained in the company's policies-and-procedures manual, but he likewise could not identify where in the manual such restrictions appeared.  Oilind cites some pipeline regulations in its reply brief to this court; we do not consider them, however, because they were never presented at trial.  *See Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1549 n.1 (10th Cir. 1992).

### 3.    Award of Front Pay

Because we remand for a new trial on the ADA claim, we need not address the issue of front pay awarded under the ADA.

### B.    FLSA Claim

### 1.    Sufficiency of the Evidence

Oilind challenges on appeal the sufficiency of the evidence to support the jury's verdict that Oilind had violated the FLSA and owed Ms. Kellogg overtime wages.  It claims that she was not covered by the FLSA because she fell under the Motor Carrier Act exemption (which we discuss in the next section of this

opinion). But Oilind did not specifically refer to the FLSA claim in its motions under Federal Rule of Civil Procedure 50(a) for JMOL after the close of Ms. Kellogg's evidence and after the close of all evidence. Nor did Oilind raise the issue in its Rule 50(b) motion after the verdict. This failure precludes our review. As the Supreme Court has recently reiterated: "A postverdict motion is necessary because determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006) (brackets and internal quotation marks omitted), *overruling Cummings v. General Motors Corp.*, 365 F.3d 944 (10th Cir. 2004).[2]

## 2. Award of Liquidated Damages

Oilind argues that the district court erred in awarding Ms. Kellogg liquidated damages after the jury found in her favor on the FLSA claim. Under 29 U.S.C. § 216(b) an employer who violates the overtime provisions of the FLSA is liable for the unpaid wages and an equal amount in liquidated damages. But there is a good-faith exception to liability for liquidated damages:

---

[2]Rule 50(b) was amended in 2006 to "permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence." Fed. R. Civ. P. 50 advisory committee's note. The amendment does not affect the requirement of a postverdict motion.

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], . . . the court may, in its sound discretion, award no liquidated damages or award any amount thereof . . . .

29 U.S.C. § 260. We review for abuse of discretion the district court's ruling on liquidated damages under the FLSA. *See Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1136 (10th Cir. 2000).

Oilind's theory at trial was that Ms. Kellogg was not covered by the FLSA because she fell within what is known as the Motor Carrier Act (MCA) exemption. This exemption applies to employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). The referenced statute permits the Secretary to "prescribe requirements for . . . maximum hours of service of employees of . . . a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2); *see* 49 U.S.C. § 13102(15) (defining motor private carrier). Because we have rejected Oilind's sole challenge to the jury's verdict that Ms. Kellogg was not an employee subject to the exemption, the remaining question is whether the district court abused its discretion in ruling that Oilind had not shown that it had acted in good faith with reasonable grounds for believing that Ms. Kellogg was not entitled to overtime wages under the FLSA.

-15-

Oilind's claim of good faith and reasonable grounds rests on a 1995 decision from a compliance officer with the Wyoming Department of Employment and a 1999 letter from an investigator with the U.S. Department of Labor, both of which Oilind claims took the position that its safety supervisors were covered by the MCA exemption. We hold that the district court could properly be unpersuaded that Oilind reasonably relied upon these sources to deny Ms. Kellogg overtime wages.

The Wyoming decision concerned a claim by a former employee of Oilind before the Wyoming Department of Employment for overtime wages under the FLSA. The claimant's position with Oilind was not described in the decision; it is apparent only that the claimant's job involved driving a truck and transporting canisters of gas. The compliance officer found that the claimant fell within the MCA exemption and that he was therefore not entitled to overtime wages. Integral to the officer's decision was a finding that the claimant had driven a truck on interstate trips in his former job, as the officer had interpreted the MCA to apply only to employees who traveled interstate or who could reasonably be expected to travel interstate. In contrast, the district court here found that "[Ms. Kellogg's] job involved almost entirely intrastate travel," Aplt. App., Vol. I at 179. Ms. Kellogg testified (and there was no contrary evidence) that her only interstate travel was a single occasion on which she combined an automobile trip to pick up her children in Colorado with an exchange of equipment in Nebraska. The facts

upon which the Wyoming decision rested being distinguishable from those in this case, the district court did not abuse its discretion by being unpersuaded that Oilind's asserted reliance on that decision was reasonable.

In the three-page letter from the U.S. Department of Labor, an investigator discussed the FLSA status of various employees at the Worland office. Regarding the safety-supervisor position, the investigator said only that "the safety supervisors are exempt from overtime as long as the U.S. Department of Transportation has the power to establish their qualifications and maximum hours of service under the Motor Carrier Act." Aplt. App., Vol. VII at 1239. This is not a definitive answer, reached after an application of the law to the facts. It is no more than a statement that the safety supervisors are exempt from the FLSA's overtime requirements if the requirements for exemption are satisfied. It was not an abuse of discretion for the district court to conclude that this letter provided no reasonable ground for reliance by Oilind.

In addition, the district court appeared to disbelieve that Oilind actually relied on the decision and letter, noting that "[Oilind] paid overtime wages to safety supervisors in other states with essentially the same job duties." *Id.*, Vol. I at 179. Although Oilind attempted to distinguish the job of safety supervisor in an oilfield office from the job of safety supervisor in other offices, the court "found such distinction artificial and without merit" and a further reflection of Oilind's lack of good faith. *Id.* at 179–80.

-17-

In conclusion, there are sound reasons for doubting both Oilind's actual reliance on the Wyoming decision or the Department of Labor letter and the reasonableness of any such reliance. The district court did not abuse its discretion in rejecting Oilind's justifications and awarding liquidated damages.

## III.    CONCLUSION

We VACATE the jury's verdict on the ADA claim and REMAND for a new trial on this claim. We AFFIRM the jury's verdict on the FLSA claim and the district court's award of liquidated damages. We REMAND for further proceedings on the award of attorney fees because they were based in part on the ADA judgment.

No. 07-8072, Kellogg v. Energy Safety Services

**HOLLOWAY**, Circuit Judge, concurring and dissenting:

I join Part II-B of the majority opinion affirming the verdict in favor of Appellee Kellogg on her FLSA claim. As to her ADA claim, I must respectfully dissent because I conclude that the district judge correctly held that driving is a "major life activity" under the ADA. Accordingly, I would also affirm the verdict on the ADA claim.

This is an issue of statutory interpretation, and so we begin with the statutory language: "major life activity." Congress chose to use broad language, employing only everyday terms, to express its intent regarding the scope of coverage of the Act. As the Supreme Court noted in *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998), Congress had used almost identical language in the Rehabilitation Act of 1973. Congress was undoubtedly aware that the courts would imply from the use of an established term that Congress intended the terms to be construed similarly in the ADA, but Congress did not rely solely on that established practice. Instead, Congress specifically provided:

> Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 or the regulations issued by Federal agencies pursuant to such title.

42 U.S.C. § 12201(a).

Thus it is clear that Congress meant the term "major life activity" to have a wide reach and that we should construe it accordingly. Giving the words their

understood and accepted meaning, keeping in mind that the use of this broad language is indicative of Congressional intent, and applying these principles in the context of modern life in our nation, I conclude that driving is clearly a major life activity, as the district judge held here.

The majority's analysis seems to me to rest almost entirely on comparison of the importance of the activity of driving with the fundamental importance of activities listed in the EEOC regulation as examples of major life activities. But as the majority notes, the EEOC regulations do not command judicial deference.[1] Moreover, it is undisputed that the examples in the regulation are not exclusive. *See Bragdon*, 524 U.S. at 638-39. It seems to me that the majority has displaced the conventional judicial task of giving ordinary terms their ordinary meaning and has implemented instead an approach that takes a list of examples from a regulation of undetermined authority as having set a floor for the meaning of the term "major," without stopping to ask whether the result is consistent with the words Congress chose to express its intent.

The majority notes that the only two circuits that seem to have addressed this question directly have held that driving is not in itself a major life activity. I am not convinced that these holdings are correct. In *Chenoweth v. Hillsborough County*, 250 F.3d 1328 (11th Cir. 2001), the entire analysis consists of little more than three sentences. Like the panel majority in the present case, the *Chenoweth* court seems

---

[1]Maj. op. at 6 n.1.

-2-

to give controlling weight to the EEOC regulations. Aside from the observation that driving is "conspicuously different in character from the activities that are listed," the *Chenoweth* court also declares that it "would at the least be an oddity that a major life activity should require a license from the state . . . ." 250 F.3d at 1329. This analysis is disconnected from the focus that should be maintained on the actual words Congress used.

The majority also relies on *Colwell v. Suffolk County Police Dept*., 158 F.3d 635 (2nd Cir. 1998). However, as Ms. Kellogg points out, Brief of Appellee at 10, the Second Circuit has more recently stated a different view. In *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2nd Cir. 2002), the Second Circuit dealt with the issue whether an alcoholic or drug abuser was impaired under definitions set forth in the ADA and the Rehabilitation Act, *inter alia.* The Second Circuit noted that to be substantially limited under analysis of the Supreme Court in *Toyota Motor Mfg., Ky. v. Williams,* 234 U.S. 184 (2002), required restriction from activities of central importance to most people's daily lives. In that context the Second Circuit stated:

> The function of "caring for one's self," we have held, "encompasses normal activities of daily living; including feeding oneself, *driving,* grooming, and cleaning home." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) (citing *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995)). *Williams* confirms that such "tasks central to most people's daily lives" constitute major life activities. 534 U.S. at ____, 122 S. Ct. at 693.

294 F.3d at 47 (emphasis added).

It has been cogently observed that "there are compelling reasons to think that driving should qualify as a major life activity. Driving appears to be 'of central importance to most people's daily lives.'" *Arnold v. County of Cook*, 220 F.Supp.2d 893, 895 n.3 (N.D. Ill. 2002) (quoting *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002)). Unlike most of the cases dealing with this issue, *Arnold* gave some support for its conclusion, noting that Census Bureau figures for 1995 showed that 91% of workers used an automobile to get to work,[2] while figures for 2000 showed that approximately 85% of Americans aged fifteen and older were licensed drivers. *Id.*[3]

This analysis, I submit, is more detailed and cogent than that exhibited in the appellate cases cited by the majority. It is also more directed to implementing the

---

[2]*U.S. Census Bureau, Statistical Abstract of the United States:* 2001, Tbl. 1091 at 693.

[3]Driving certainly was an activity of central importance to Ms. Kellogg's daily life. As the district judge found, she was required to travel to well sites that were a two-hour drive from the company's offices. Nor was Ms. Kellogg's dependence on driving particularly unusual for a Wyoming resident. The judge said he believes:

> . . .there is no question that in Wyoming, where public transportation
> is virtually non-existent, distances between towns is [sic] measured
> by hours of driving, economic conditions often require residents to
> seek employment outside of their local community, and long winter
> conditions significantly limit foot or bicycle travel, driving is clearly
> a major life activity.

Order Granting in Part, and Denying in Part, Defendant's Motion for Summary Judgment at 7, I Aplt. App. at 33.

legislative intent. Driving is of central importance to the daily lives of a great majority of Americans, as both common experience and Census Bureau statistics tell us. Accordingly, it is a major life activity and no convincing contrary evidence or analysis is offered. Therefore, I must dissent from the ruling vacating the verdict for Ms. Kellogg on her ADA claim.