## In the
# United States Court of Appeals
### For the Seventh Circuit

No. 08-2339

MARSALETTE S. WINSLEY,

*Plaintiff-Appellant*,

*v.*

COOK COUNTY, doing business
as Cook County Department
of Public Health,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-06837—**Elaine E. Bucklo**, *Judge*.

ARGUED FEBRUARY 11, 2009—DECIDED APRIL 22, 2009

Before BAUER, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Marsalette S. Winsley filed this
action in the United States District Court for the
Northern District of Illinois against her former employer,
Cook County, Illinois (the "County"), alleging violations

of the Americans with Disabilities Act ("ADA"),[1] 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Cook County filed a motion for summary judgment, which the district court granted. Ms. Winsley then filed this appeal. For the reasons set forth in this opinion, we now affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Marsalette Winsley is an African-American woman. She was employed, beginning in October 2001, as a Public Health Nurse I for the Department of Public Health for Cook County, Illinois. Prior to July 2003, she was assigned as a Genetics and Perinatal Hepatitis Coordinator in Oak Park, Illinois. In July of that year, Ms. Winsley took a leave of absence to undergo a hysterectomy and kidney surgery. Ms. Winsley returned to work in December 2003 and was assigned as a Family Case Manager in Maywood, Illinois. The position required her to drive to the homes of her clients in order to evaluate their condition and development.

In March 2004, Ms. Winsley was involved in an automobile accident. She did not seek emergency medical

---

[1] The ADA recently was amended by the Americans with Disabilities Amendments Act, which took effect on January 1, 2009. The pre-amendment version of the ADA applies to Ms. Winsley's suit.

treatment after the accident, but she did contact her psychiatrist, Dr. Michael Bednarz, to tell him that she was suffering from panic attacks and inability to sleep. She also went to see her primary care physician; she told her doctor that she "had some pain in her head and along her left side" that lasted for "approximately two or three weeks after the accident." R.36 at 3. In April 2004, Dr. Bednarz diagnosed her with post-traumatic stress disorder ("PTSD"). On his recommendation, Ms. Winsley took a leave of absence from April 6 through the end of the month. On April 24, Dr. Bednarz informed the County by letter that Ms. Winsley "could return to work part-time with minimal work-related driving." *Id.* at 4. Dr. Bednarz explained that the driving restriction was necessary because Ms. Winsley "would go into a full panic when she got into a car." *Id.*

For the six weeks following her leave of absence, the County allowed Ms. Winsley to work part-time at an office closer to her home. In early June 2004, however, the County informed her that she could not continue to work part-time and still retain her classification as a Public Health Nurse I. The County presented Ms. Winsley with four options: (1) "[r]equest a disability leave of absence and pursue benefits through the County's Annuity and Benefits Office," (2) "[r]esume full-time duties of a Public Health Nurse in Maywood, including field duties," (3) "[r]equest reassignment with demotion to a clinic nurse position," or (4) "[r]equest reassignment to part-time status . . . in the category of Registered Nurse I." *Id.* at 6. Ms. Winsley chose the first option, and her disability leave of absence began in June. Also in June, Dr. Bednarz sent another note to the County informing

it that Ms. Winsley "was still having severe symptoms of PTSD and continued to have difficulty driving." *Id.*

Ms. Winsley returned to work in December 2004 and was assigned once again to the Maywood office. She drove to and from work but did not drive to visit clients. She stopped coming to work in March 2005 and did not return to work until May of that year. In early May, Dr. Bednarz sent another note informing the County that Ms. Winsley could return to work if she did not have to drive during the work day, worked only 32 hours per week with Wednesdays off, and, if possible, was relocated to an office within 15 miles of her home. For the next eight weeks, the County did not require Ms. Winsley to drive during the day and let her have Wednesdays off. During this period, however, she received "unsatisfactory" evaluations for attendance and timeliness.

Around this time, Ms. Winsley told her supervisor that her co-workers were making her uncomfortable by asking her why she had been off work. Her supervisor directed the assistant supervisor to speak with Ms. Winsley's co-workers individually about the issue. Ms. Winsley wanted the supervisors to call a staff meeting to discuss the matter, but the supervisors declined to do so. At the next regular staff meeting, Ms. Winsley "announced that she wanted to say some-thing to her peers about interrupting her work to ask her personal questions." *Id.* at 8. Her supervisors asked her to stop, but she refused. After being asked to stop a second time, she left the meeting. She went on a leave

of absence the next day. In June 2005, she filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race and disability.

In late June 2005, Dr. Bednarz sent another note to the County informing it that Ms. Winsley could not return to work unless she was granted the previously requested changes to her work requirements. The County then requested that Ms. Winsley and her physician fill out a "Physical Demands Analysis" form to determine whether she could perform the essential job functions for her position. The analysis form stated that one of these functions was driving for two hours out of the eight-hour work day. Dr. Bednarz responded with a note stating that Ms. Winsley's "only restriction is no more driving than to & from work, otherwise full duty." *Id.* at 11.

Ms. Winsley returned to work in late November 2005. On November 22, she filed a union grievance. The County then agreed to reassign her to the Bridgeview office if Dr. Bednarz cleared her to do the two hours of driving required by her position.

In June 2006, Ms. Winsley missed approximately twenty days of work due to a house fire. On May 22, 2007, Ms. Winsley's supervisor gave her a memorandum noting her absenteeism over the previous eleven weeks and asking for an improvement over the following two months. On May 25, without notice, Ms. Winsley stopped going to work. She never returned to work, and formally resigned from her position on October 15, 2007.

**B.**

Ms. Winsley then filed this action in the United States District Court for the Northern District of Illinois, alleging that the County had violated the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964. She also alleged that the County had engaged in retaliation after she filed her EEOC claim. After discovery, the County moved for summary judgment on all counts. In her response, Ms. Winsley cited repeatedly to assertions she had made in her own deposition, but did not point to any other evidence in support of her claims.

The district court granted summary judgment to the County on all of Ms. Winsley's claims. On her ADA claim, the court concluded that Ms. Winsley had not produced evidence sufficient to establish that she had a "disability" as that term was defined in the ADA. The court also held that she had failed to establish that she was otherwise qualified to perform the essential functions of the job. Because she had failed to establish these two required elements, the court granted summary judgment on her ADA claims.

On her Title VII claim, the court concluded that Ms. Winsley had not made out a prima facie case of racial discrimination under either the direct or indirect method of proof. The court noted that she did not cite any direct or circumstantial evidence in the record that would support her argument under the direct method of proof. As to the indirect method of proof, the court held that she had not made out a prima facie case of discrim-

ination because her deposition testimony—the only evidence she offered in support of her claims—did not establish that any similarly situated employee was treated more favorably.

Finally, the district court concluded that Ms. Winsley failed to establish a genuine issue of material fact on her retaliation claim. The court held that her claim failed under the direct method because she had not established that the County had created a "hostile work environment" in response to her EEOC claim. The court also concluded that she had not made out a prima facie case via the indirect method, because, once again, her deposition testimony did not establish the existence of a similarly situated employee who was treated more favorably.

Ms. Winsley filed a timely appeal of the district court's decision.

## II

### DISCUSSION

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the non-moving party's favor. *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). Summary judgment is proper if the pleadings, discovery and disclosure materials on file, as well as any affidavits, demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c).

**A. Americans With Disabilities Act**

To establish a violation of the ADA, an employee must show: "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (citations omitted).

The district court concluded that Ms. Winsley had failed to establish genuine issues of material fact as to the first and second required elements of an ADA claim. Ms. Winsley submits that the court's determination was erroneous.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(2). The only potential impairment supported by the evidence is Ms. Winsley's claim that she had difficulty driving. Although this court has reserved judgment on whether driving is a major life activity, *Sinkler v. Midwest Property Mgmt. Ltd. P'ship*, 209 F.3d 678, 685 (7th Cir. 2000), three other circuits have held that it is not. *See Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008); *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329-30 (11th Cir. 2001); *Colwell v. Suffolk County Police Dep't.*, 158 F.3d 635, 643 (2d Cir. 1998).

Today we agree with our sister circuits and hold that driving is not, in itself, a major life activity. The version of the ADA applicable to Ms. Winsley's action, *see* note 1,

*supra*, does not define the term "major life activity," but an EEOC regulation states that "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).[2] Although this list does not purport to be exclusive, the items on the list have several things in common with each other that driving does not share with them. Most importantly, the listed activities are so important to everyday life that almost anyone would consider himself limited in a material way if he could not perform them. This is not the case with driving. In fact, many Americans choose not to drive and do not consider the quality of their lives to have been diminished by their choice. Moreover, the importance of the listed activities does not vary depending

---

[2] The EEOC's interpretation is not necessarily entitled to any special deference by the courts, because Congress has not given that agency the authority to interpret the ADA. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002) *(*"Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are, and we have no occasion to decide what level of deference, if any, they are due."). However, the EEOC's interpretation of what Congress meant by "major life activity" in the ADA is bolstered by the fact that when Congress amended the ADA last year, it added to the statute a definition that is quite similar to the EEOC's: "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (effective Jan. 1, 2009).

on where a person lives. The value that people assign to
being able to drive, on the other hand, most certainly
does. A great number of Manhattanites drive only rarely,
while residents of more sparsely populated areas of our
country rely heavily on their own automobiles for trans-
portation. Finally, unlike the listed activities, no one has
a right to drive; driving on public highways is a privilege
subject to revocation for a number of reasons. As the
Eleventh Circuit has noted, "[i]t would at the least be an
oddity that a major life activity should require a
license from the state, revocable for a variety of reasons
including failure to insure." *Chenoweth*, 250 F.3d at 1329.

Although we hold that driving is not itself a major
life activity, the inability to drive nevertheless could create
a disability if it caused an impairment of a major life
activity. For example, we have held that working is a
major life activity. *Sinkler*, 209 F.3d at 684. As such, if
Ms. Winsley's inability to drive impaired her ability to
work, then she would have a qualifying disability under
the ADA. *See id.* at 685 (evaluating whether the plaintiff's
inability to drive to and from work "constituted a signifi-
cant barrier to her employment," thereby impairing her
ability to work). *See also Kellogg*, 544 F.3d at 1126 (noting
that "an inability to drive will sometimes enable the
plaintiff" to prove impairment of the ability to work);
*Chenoweth*, 250 F.3d at 1330 (affirming summary judg-
ment against a plaintiff who failed to establish that "her
inability to drive substantially limited her ability to work").

To show substantial impairment of the ability to work,
however, a plaintiff must show that the impairment

"significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes." *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir. 1998) (citation and quotation marks omitted). "[A]n inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Id*. Ms. Winsley presented no evidence to the district court indicating that her inability to drive disqualified her from a class or range of jobs. Thus, Ms. Winsley did not meet her burden of producing evidence to establish a genuine issue of material fact as to whether she had a disability as defined by the ADA. Because such a disability is a required element of an ADA claim, the district court properly granted summary judgment to the County.

**B. Title VII**

A plaintiff can establish a racial discrimination claim under Title VII in two ways. Under the "direct method," she must present direct or circumstantial evidence that creates a "convincing mosaic of discrimination" on the basis of race. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Under the indirect method, she must establish a prima facie case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside

the protected class more favorably. *O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 983 (7th Cir. 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The district court held that Ms. Winsley failed to meet her burden via either method of proof. The court concluded that her claim came up short under the direct method because her deposition testimony—again, the only evidence to which she cited in her opposition to summary judgment—provided neither direct nor circumstantial evidence that her supervisors discriminated against her because of her race. The court also held that she had not established a prima facie case, as required under the indirect method of proof, because she had not identified a similarly situated employee who was treated differently from the way she was treated.

We agree with the district court that Ms. Winsley fell far short of meeting her burden of proof under either the direct or the indirect method. Her claim fails under the direct method because she did not produce evidence from which a jury could conclude that the County or any of its employees subjected her to discriminatory treatment because of her race. The only evidence she presented was her own deposition testimony that the County mistreated her because of her race. These bare assertions are not sufficient to establish a link between Ms. Winsley's race and her treatment by the County. *See, e.g.*, *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.").

Ms. Winsley's claim fails under the indirect method because she is unable to identify a "similarly situated

employee outside the protected class" who was treated more favorably than she was. "To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted).

In her deposition, Ms. Winsley pointed to a Caucasian nurse named Mary Ann Hanley. Ms. Winsley claimed that Hanley suffered a similar disability but, unlike Ms. Winsley, was not required to drive to visit clients. However, Ms. Winsley's deposition testimony states only that Hanley "had some type of medical issue similar to mine," and goes on to admit that Ms. Winsley does not know "[e]xactly what it was." The record on summary judgment did not provide any other details about Hanley's condition or other relevant characteristics. Ms. Winsley had the opportunity, during discovery in this case, to request documents and conduct depositions of County employees in order to shed light on whether Hanley was, in fact, similarly situated. She failed to do so, and her vague assertions alone do not establish that Hanley was directly comparable to her in all material respects. Even if the record were sufficient to establish that Hanley and Ms. Winsley were similarly situated, however, it is far from clear that Hanley was treated more favorably. Ms. Winsley admitted in her deposition that around the same time the County asked her to undergo the Physical Needs Analysis, it required Hanley to do so as well. Hanley chose to end her employment with the County rather than undergo the analysis. This does not

appear to be favorable treatment. Thus, Ms. Winsley failed to satisfy the fourth requirement of the *McDonnell Douglas* framework, and summary judgment for the County was appropriate.

Ms. Winsley's discrimination claim also fails the second requirement of the *McDonnell Douglas* framework, because she has not established that her job performance was meeting the County's legitimate expectations. The record establishes, and Ms. Winsley does not dispute, that attendance was a legitimate requirement for Ms. Winsley's position. The record also establishes, and Ms. Winsley also does not dispute, that her attendance record did not meet the County's expectations for employees in her position. Ms. Winsley's claim, therefore, fails on this basis as well.

## C. Retaliation

The district court granted summary judgment to the County on Ms. Winsley's retaliation claim because it concluded that she had not established retaliation via either the direct or indirect method. Her claim failed under the direct method because she had not presented evidence that her employer took an adverse employment action against her after she filed her EEOC claim. Ms. Winsley alleged that her supervisors created a hostile work environment after she filed her claim, but did not present evidence showing that the conduct she complains of—questions and disruption of her work by co-workers inquiring as to why she had taken leave—"was severe and pervasive so as to alter the conditions of [her]

environment and create a hostile and abusive working environment." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). Thus, the district court concluded that she had not made out a retaliation claim via the direct method. For the same reasons, we agree with the district court that summary judgment was proper.

The district court also concluded that Ms. Winsley's claim failed under the indirect method of proof because, as discussed above, she failed to identify a similarly situated co-worker who was treated more favorably. Ms. Winsley again points to Mary Ann Hanley, but the record does not establish whether Hanley was similarly situated, and there is also nothing in the record indicating whether Hanley also filed an EEOC claim. Without identifying a similarly situated employee, Ms. Winsley could not make out a prima facie case of retaliation under the indirect method. Thus, her retaliation claim fails.

## Conclusion

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED