**13-111-cv**
*Abrams v. Dept. of Pub. Safety*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————

August Term, 2013

(Argued: April 29, 2014      Decided: August 26, 2014)

Docket No. 13-111-cv

FREDERICK M. ABRAMS,

*Plaintiff-Appellant*,

−v.−

DEPARTMENT OF PUBLIC SAFETY, STATE OF CONNECTICUT, JOHN A
DANAHER, III, COMMISSIONER, I/O STEVEN FIELDS, MAJOR, I/O, PATRICK
O'HARA, LIEUTENANT, I/O, JOHN TURNER, SARGEANT, I/O, BARBARA
LYNCH, AFFIRMATIVE ACTION OFFICER, I/O,  SEAN COX,

*Defendants-Appellees*.

—————

Before:
WALKER, POOLER, AND WESLEY, *Circuit Judges*.

Defendants petition for rehearing following our decision in *Abrams v. Dep't
of Pub. Safety*, No. 13-111-cv, 2014 WL 3397609 (2d Cir. July 14, 2014).  The

petition is granted, and the opinion filed July 14, 2014 is withdrawn. For the reasons that follow in our revised opinion, we AFFIRM the district court's grant of summary judgment as to the Title VII retaliation claim pertaining to Plaintiff's Casino Unit transfer and the jury's verdict in favor of Defendants as to the Title VII retaliation claim. We VACATE the district court's grant of summary judgment of the Title VII race discrimination claim, as well as the corresponding race discrimination claim brought under the Equal Protection Clause pursuant to 42 U.S.C. § 1983, and REMAND for further proceedings consistent with this opinion.

> W. MARTYN PHILPOT, JR., Law Office of W. Martyn Philpot, Jr. LLC, New Haven, CT, *for Plaintiff-Appellant*.
>
> ANN E. LYNCH, Assistant Attorney General (Antoria D. Howard, Associate Attorney General, *on the brief*), *for* George Jepsen, Connecticut Attorney General, Hartford, CT, *for Defendants-Appellees.*

WESLEY, *Circuit Judge*:

Defendants petition for rehearing following our decision in *Abrams v. Dep't of Pub. Safety*, No. 13-111-cv, 2014 WL 3397609 (2d Cir. July 14, 2014). The

petition is granted, and the opinion filed July 14, 2014 is withdrawn. For the

reasons that follow in our revised opinion, we AFFIRM the district court's grant

of summary judgment as to the Title VII retaliation claim pertaining to Plaintiff's

Casino Unit transfer and the jury's verdict in favor of Defendants as to the Title

VII retaliation claim. We VACATE the district court's grant of summary

judgment of the Title VII race discrimination claim, as well as the corresponding

2

race discrimination claim brought under the Equal Protection Clause pursuant to 42 U.S.C. § 1983, and REMAND for further proceedings consistent with this opinion.

On appeal, Plaintiff-Appellant Frederick M. Abrams ("Abrams") challenges a March 31, 2012 order of the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) and a December 5, 2012 jury verdict (Charles B. Kornmann, *Judge*).  Abrams brought claims under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Against Defendant-Appellee Department of Public Safety ("DPS"), he alleges Title VII race discrimination for his failure to be transferred into the district's Major Crimes Van (the "Van"); he also alleges that his continued failure to be transferred to the Van, as well as his transfer to the Casino Unit after his complaints about discrimination, constitute retaliation under Title VII.  Against the individual Defendants-Appellees, Abrams claims a violation of the Equal Protection Clause pursuant to § 1983 for continued non-assignment to the Van.

The district court granted Defendants-Appellees' motions for summary judgment as to the Title VII discrimination and § 1983 claims as to all individual officers.  *Abrams v. Dep't of Pub. Safety*, 856 F. Supp. 2d 402, 411-12 (D. Conn.

3

2012). The district court also granted summary judgment as to the Title VII retaliation claim regarding Abrams's assignment to the Casino Unit, but denied summary judgment for retaliation regarding his continued non-assignment to the Van. *Id*. at 412-13. Following a trial, a jury found for DPS on the remaining retaliation claim. On appeal, Abrams now challenges the district court's grant of summary judgment to Defendants and the judgment in favor of DPS after trial.

## BACKGROUND[1]

### *Overview of Abrams and the Van*

Abrams, a black male, joined DPS in 1986. In 1990, he was made a detective in the Eastern District Major Crimes Unit ("EDMCU"), a division that houses more than thirty detectives working on major crimes but not homicides. Homicides, at least in part, are handled by the EDMCU's crime van (the "Van").

The Van is a specialized unit comprised of five to six EDMCU detectives who investigate serious crimes, suspicious deaths, and homicides. Van detectives have the same pay and benefits as other detectives and no change in title, but assignment to the Van is considered an elite position occupied by the "best of the best of troopers." (Matthews Dep. 16). Van duty is a demanding job;

---

[1] Unless otherwise noted, the following facts are taken from the parties' Rule 56.1 statements and are undisputed.

4

assigned detectives must be on call 24 hours a day, seven days a week. There is no formal application process for assignment to the Van. When an opening becomes available, interested detectives simply submit their names and resumes. Defendants Sergeant John Turner and Captain Patrick O'Hara, under the supervision of Lieutenant Colonel Steven Fields, then select a detective for the Van. Seniority is a factor in selecting among applicants; a college degree is not a prerequisite.

### *Abrams's Performance Reports*

Abrams has unsuccessfully sought to join the Van since 1998. He has received various reasons for his continued non-selection, including that he had a history of poor performance evaluations with regard to written reports. While at the State Police Training Academy in 1986, Abrams underperformed in areas including report writing, knowledge of the penal code, and criminal investigations. When placed in his first assignment out of the academy, however, performance reports indicated that Abrams had made a "concerted effort and overcame these problems." (Ex. 10, Trooper Perf. Eval. and Observ. Rep. for Oct. 1986 through Oct. 1987). In 1990, Abrams was transferred to the EDMCU, where his report writing met with differing reviews; he received

5

occasional criticism from some supervisors, while others either noted improvement or offered positive evaluations. (Ex. 12, Trooper Perf. Eval. and Observ. Rep. for Oct. 1990 to Oct. 1991; Ex. 13, Trooper Perf. Eval. and Observ. Rep. for Oct. 1992 to Oct. 1993; Ex. 14, Trooper Perf. Eval. and Observ. Rep. for Oct. 1996 to Oct. 1997; Ex. 15, Trooper Perf. Eval. and Observ. Rep. for Oct. 1998 to Oct. 1999; Ex. 16, Trooper Perf. Eval. and Observ. Rep. for Oct. 1991 to Oct. 1992; Ex. H, Trooper Perf. Eval. and Observ. Rep. for Oct. 2005 to Oct. 2006).

Perhaps the most salient of these performance evaluations were those given by Sergeant Thomas Wakely, who supervised Abrams from 2001 to 2008— prior to and during much of the period relevant to this case. Although Wakely rated Abrams's communication skills (which include report writing) as "unsatisfactory" in his Spring 2001 evaluation, he noted in a late 2002 evaluation that Abrams's skills were improving. (*Compare* Ex. 17, Trooper Perf. Eval. and Observ. Rep. for April 2001 to June 2001, *with* Ex. 19, Trooper Perf. Eval. and Observ. Rep. for Nov. 2002 to Dec. 2002). The improving evaluations continued in early Spring 2003, when Wakely again noted improvement and rated Abrams's report writing as "satisfactory." (Ex. 20, Trooper Perf. Eval. and Observ. Rep. for Feb. 2003 to Mar. 2003). Notwithstanding a late Spring 2003

evaluation in which Wakely noted that Abrams needed improvement in his report writing, Abrams's upward trend continued through 2008 when Wakely was replaced by Sergeant Sean Cox as Abrams's supervisor. (Ex. 21, Trooper Perf. Eval. and Observ. Rep. for April 2003 to May 2003; Ex. 22, Trooper Perf. Eval. and Observ. Rep. for Oct. 2005 to Oct. 2006).

*Applicants Selected to the Van over Abrams, 2004 to 2009*

During his tenure at EDMCU, Abrams was one of no more than three black detectives and was the only one to ever express interest in joining the Van. From 2004 through 2009, the time period relevant to Abrams's claims, all eight detectives selected for and assigned to the Van were white. Although some of these detectives had a college degree, which Abrams lacked, Abrams had more training and seniority than each of the detectives selected above him. The detectives' respective qualifications are summarized briefly:

- Detective Leitkowski, assigned in 2004, possessed special forensic drawing and crime scene diagramming skills.
- Detective McFadden, assigned in 2006, possessed "strong investigatory skills" and excellent report writing (according to Turner, who recommended him).
- Detective Payette, assigned in 2007, had strong technical investigatory and electronic equipment skills, and a college degree.

7

When Wakely spoke to O'Hara about Payette's selection over Abrams, whom Wakely had recommended, O'Hara noted that Payette would "fit in better" and noted his college degree.

- Detective Vining, assigned in 2008, was the only woman in the Van, had skills related to crimes on children and forensic interviewing of children, and had a college degree in Psychology.

- Detective Lamoureux, also assigned in 2008, had strong investigatory and interviewing skills and a college degree in Criminal Justice and Law Enforcement Administration.

- Detective Hoyt, the last detective assigned to the Van in 2008, had expertise working with other agencies and handling cases involving children and sexual assault. Hoyt also had a college degree in Justice and Law Administration.

- Detective Cargill, assigned in 2009, was an emergency medical technician and had strong investigatory and report writing skills.

- Detective Kasperowski, assigned in late 2009, held bachelor's and master's degrees. According to Defendant Cox, he also had excellent interviewing skills and success solving sexual assaults.

*The "Fit In" Statements*

When a spot opened in the Van in 2007, Wakely personally recommended Abrams to the selection committee; Wakely rated Abrams "superior" in every category and noted in a March 2007 meeting about his recommendation of

8

Abrams that Abrams's reports were greatly improved and "fantastic." (Wakely Dep. 55-57). Wakely reported that notwithstanding his recommendation of Abrams, O'Hara found Detective Payette – a different applicant – to be a "better fit" for the Van than Abrams. In communicating this to Wakely, O'Hara apparently also noted that Payette had a college degree. (Wakely Dep. 49-51). During his deposition, Wakely stated that it "crossed his mind" that O'Hara's "better fit" statement could relate to race. (Wakely Dep. 83-84).

This was not the first time such words were used by those charged with selecting Van applicants to explain Abrams's continued rejection. For instance, at some point between 2000 and 2004 during a discussion concerning the selection committee's continued decision not to assign Abrams to the Van, Detective Contre, himself a member of the Van consulted during the selection process, told Detective Andrew Matthews that Abrams "did not fit in." (Matthews Dep. 25).

### Abrams's Reports of Discriminatory and Retaliatory Behavior

At some point between 2004 and 2009, Abrams spoke with DPS's Affirmative Action Officer Barbara Lynch about his concern that the selection committee was passing him over because of race. There is some dispute as to

9

what Lynch told Abrams, but at the very least he felt that she would not take action. As a result, he never filed a complaint with her. Instead, in April 2007, Abrams filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging that DPS discriminated and retaliated against him by assigning Detective McFadden and another white detective to the Van instead of him. At some point shortly thereafter, Fields ordered O'Hara and Turner to allow Abrams to ride with the Van.[2] Abrams was called several times, but he was either in class or on vacation and did not ride until the morning of June 21, 2007. That morning, the Van members went to breakfast together after leaving a crime scene. In his deposition, Abrams stated that the other detectives on the Van made him feel like he did not belong. (Abrams Dep. 85-86). He was not called to ride again.

On September 25, 2007, Abrams filed another CHRO complaint alleging retaliation and a hostile work environment. He specifically mentioned the June 21 incident, stating that his fellow detectives "gave [him] the feeling that [he] didn't belong at the crime scene, and that they had to tolerate [him] which gave

---

[2] This was actually the second time Fields made such an order. Between 2003 and 2005, when Fields was District Commander of the EDMCU, he ordered the Van to allow Abrams to ride. For whatever reason, Abrams was never called to the Van.

10

[him] the feeling that this was a hostile environment." (Ex. 48, Comm. Human Rights and Opportunities Retaliation/Hostile Work Environment Complaint, Sept. 25, 2007). After Abrams filed this CHRO complaint, legal affairs and Fields instructed Turner "that [he] had to keep [his] distance basically," that he should not have contact with the Abrams. (Turner Dep. 78). Because Turner ceased speaking with Abrams, he did not receive information about Abrams's continued interest in being on the Van, and he would not have "reach[ed] out" to Abrams to ask him to join the Van had he known of Abrams's interest. (Turner Dep. 80). Turner stopped considering Abrams for vacancies on the Van (Turner Dep. at 78-80), including the vacancy ultimately filled by Detective Cargill, whom Abrams matched in skill set (emergency medical technician) and education, and exceeded in seniority and training. (Turner Dep. 83).

Abrams filed several more complaints. A November 2007 CHRO complaint alleged discrimination and retaliation on the basis that Abrams was not being assigned to participate in investigations. In March 2008, Abrams sent a letter to the Commissioner of the State Police alleging discrimination and a hostile work environment. In December 2009, Abrams filed a CHRO complaint alleging discrimination and harassment.

As mentioned before, Cox replaced Wakely as Abrams's supervisor in 2007 and 2008. Abrams felt that that Cox over-scrutinized his reports, made unnecessary corrections, and inappropriately talked with other Detectives about Abrams's cases instead of discussing them with Abrams directly. Because of this, in 2010, Abrams filed a complaint against Cox with the DPS Affirmative Action Office, which was found to be unsubstantiated; a CHRO complaint was never filed against Cox.[3]

### Abrams's Reassignment to Casino Unit

In May 2010, detectives in Abrams's troop complained to Cox that Abrams made them feel uncomfortable at work. Cox forwarded emails from those detectives to his superiors. Later that month, approximately five months after Abrams's last CHRO complaint, Fields held a meeting with DPS's lawyers, departmental supervisors, and human resources personnel. At the end of the meeting, Fields decided to reassign Abrams to the Casino Unit, pending an investigation of the complaints against him. At the Casino Unit, Abrams retained his title, his status as a member of the EDMCU, and his salary, but he no

---

[3] The district court dismissed all claims against Cox, as Abrams had failed to exhaust the administrative remedies in the claims against him. On appeal, Abrams offers nothing to dispute this. We therefore consider this claim abandoned.

longer participated in Major Crime investigations—his Casino Unit work largely consisted of background checks—and his commute doubled.

In December 2010, Abrams was transferred back to Major Crimes, but assigned to Troop C in Tolland instead of Troop K in Colchester, where he had worked before his transfer. He remains in Tolland.

### *The Instant Action*

On April 6, 2009, Abrams filed suit under Title VII and § 1983, asserting that Defendants discriminated against him based on his race and retaliated against him by continuing to reject his applications to the Van and by sending him to the Casino Unit. On March 31, 2012, the district court (Chatigny, *J.*) granted Defendants' motions for summary judgment as to the Title VII discrimination claim and the § 1983 claims. The district court also granted Defendants' summary judgment as to Abrams's Title VII retaliation claim regarding his assignment to the Casino Unit. Only one claim survived for trial: Abrams's Title VII retaliation claim against DPS for denial of assignment to the Van after his CHRO complaints. Following a three day trial (Kornmann, *J.*), a jury found for DPS. Abrams now challenges both the district court's grant of summary judgment to Defendants and the judgment in favor of Defendant DPS

13

after trial.  We AFFIRM in part and DENY in part the district court's order of summary judgment, AFFIRM the jury verdict, and REMAND for further consideration in keeping with this opinion.

## DISCUSSION

### A.     Title VII Discrimination Claim Against DPS and § 1983 Equal Protection Clause Claim Against Individual Defendants[4]

Courts analyze Title VII discrimination claims under the now-familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*,  411 U.S. 792, 802-04 (1973).  Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999).

A plaintiff presents a prima facie case when he establishes: (1) that he belonged to a protected class; (2) that he was qualified for the position he sought; (3) that he suffered an adverse employment action; and (4) that the adverse

---

[4] "We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences and resolving all ambiguities in favor of the non-movant."  *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (internal quotation marks omitted).

employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). It is undisputed that Abrams has successfully shown elements 1, 2, and 4; as an AfricanAmerican he is a member of a protected class; he was qualified to be in the Van; and because all the detectives assigned to the Van were white, the circumstances permit an inference of discrimination.

Thus, to make out a prima facie case, the only remaining issue is the third element; that is, whether Abrams suffered a materially adverse change in employment. The district court called this element a "close case" and avoided resolving the matter conclusively because it determined that even had Abrams made out a prima facie case, he could not establish pretext at the final step of the *McDonnell Douglas* analysis. *Abrams*, 856 F. Supp. 2d at 409. Neither party has argued in their briefs before us that, on the record before the district court, we should decide that which the district court assumed—that denying Abrams an appointment to the Van constituted an adverse employment action. (*See*

Appellant's Br. 15-17; Appellee's Br. 12-14).[5] We too assume arguendo that

Abrams has made out a prima facie case.[6]

Defendants put forth legitimate non-discriminatory reasons that Abrams

was not selected for the Van: (1) he—unlike five of the eight others selected—did

not have a college education; (2) all members were selected for their specific

skills or talent in investigation, report writing, or strong evaluations, and Abrams

was not similarly situated to those selected; and (3) Abrams had ongoing

problems with report writing.

This brings us to the final part of the *McDonnell Douglas* analysis, the point

where Abrams's case failed on summary judgment. The district court found, in

relevant part, that Abrams had failed to produce sufficient circumstantial

evidence to support a reasonable inference of discrimination. *Abrams*, 856 F.

Supp. 2d at 410-11. Central to this finding, however, was the court's exclusion of

two statements proffered by Abrams: (1) Contre's comment to Matthews that

Abrams "did not fit in" with the other Van members ("Contre Statement"); and

---

[5] Of course, the district court's "close call" conclusion was based on the summary judgment standard of reviewing the facts in the light most favorable to Abrams.
[6] We are mindful of the fact that under the *McDonnell Douglas* framework, the question of whether a prima facie case is established is an issue of law for the trial judge. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F. 3d 111, 116 (2d Cir. 2000). Thus the district court now must resolve the "close case."

(2) O'Hara's comment to Wakely that Payette would "fit in better" than Abrams ("O'Hara Statement") (collectively the "Fit In Statements"). *Id*. at 411. The court excluded these statements on the basis that they were inadmissible hearsay and further stated that "there is insufficient evidence to permit a finding that 'fitting in' referred to plaintiff's race." *Id.* Both of these conclusions were erroneous.

As to the hearsay issue, neither statement is presented for the truth of the matter contained therein; the issue before the court was emphatically *not* whether Abrams was or was not a good fit, but whether those statements were made, and whether they concerned Abrams. *See* Fed. R. Evid. 801(c). As neither of those factors is disputed, the statements are not hearsay and are admissible.[7]

The second question is whether these statements support a reasonable inference of discrimination. This question is crucial to Abrams's case as none of the other evidence proffered by Abrams[8] passes muster. It strikes us as somewhat ironic, that while the court correctly excluded Wakely's sense of what the statement he heard implied, the court did not consider that Wakely's

[7] We note that while the statements were improperly excluded as hearsay evidence, we take no position as to whether, on remand, they might be properly excluded on other bases not considered here.

[8] Before the district court, Abrams attempted to demonstrate pretext through a history of discrimination at DPS from the 1980s and a racist cartoon in someone's workspace, among other things. The district court correctly decided that these did not establish pretext and Abrams gives us no cause to revisit this determination on appeal.

impression itself bespeaks of an inference that a jury could reasonably make. In fact, the court seemed to struggle with the conflicting inferences Wakely and Matthews drew from these comments and discussed in their depositions: "While Matthews did not believe Contre was referring to race, it did cross Wakely's mind that O'Hara could be referring to race." *Abrams*, 856 F. Supp. 2d at 410.[9] Indeed, the court's acknowledgement of the differing opinions of Matthews and Wakely belies the court's ultimate finding that no question of fact could exist in the mind of a reasonable juror on the issue of pretext.

Wakely's and Matthews's impressions, while illustrative here, are not isolated. The Fifth Circuit expressed similar concerns with "fit in" phrasing when it was proffered by an employer at the second stage of *McDonnell Douglas* analysis:

> In fact, the explanation given by the [employer], i.e., that [employee] was not "sufficiently suited" for the position—even including [supervisor's] belief that she would not "fit in"—does not necessarily qualify as a "nondiscriminatory" reason. After all, a hiring official's subjective belief that an individual would not "fit in" or was "not sufficiently suited" for a job is at least as consistent with

---

[9] In addition, the district court seemed to think that because Wakely was not "involved in the decision-making process" and did not make reference to "an objective basis" for his impression, that impression was suspect. *Abrams*, 856 F. Supp. 2d at 411. But Wakely knew the quality of Abrams's work, wrote glowing recommendations of that work, and knew that Abrams had been passed over before. Thus the court's justification for dismissing Wakely's impression is unfounded.

discriminatory intent as it is with nondiscriminatory intent: The employer just might have found the candidate "not sufficiently suited" *because of* a protected trait such as age, race, or engaging in a protected activity. We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement, such as that a candidate is not "sufficiently suited" for the position, is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas*. It is, at bottom, a non-reason.

*Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).

While in this case we apply the rationale to the third *McDonnell Douglas* factor of pretext, the underlying reasoning holds: the phrasing "better fit" or "fitting in" <u>just might</u> have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury. It is enough of an ambiguity to create a reasonable question of fact.

Moreover, the district court erred in relying on *Byrnie v. Town of Cromwell*, *Board of Education* in excluding the Fit In Statements. 243 F.3d 93, 103 (2d Cir. 2001) ("[T]he plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." (internal quotation marks omitted)).

19

Abrams's non-assignment to the Van as well as the Fit In Statements make this a case about more than mere "discrepancy in qualifications" as was the case in *Byrnie*. The Fit In Statements raise a genuine dispute as to whether the proffered reasons for Abrams's non-assignment to the Van were pretextual.

Finally it is worth noting that Defendants' non-discriminatory reasons for not selecting Abrams—particularly their citation to his poor writing reviews and lack of a college education—are questionable: the poor writing reviews, for example, are largely from his time in police training many years earlier, and varied considerably after that; and more than one-third of persons selected for the Van did not have a college education.

Balancing all of these factors, we see this as a very close case, and one, when considered in the light most favorable for the non-moving party—as it must be—that is simply too close to call and should be a question for a jury. Accordingly, we vacate the judgment of the district court granting summary judgment to Defendants on Abrams's Title VII discrimination claim against DPS; and because the analysis is parallel under Abrams's § 1983 Equal Protection Clause claim, we vacate this decision as well and reinstate the relevant individual Defendants.

**B.** **Title VII Retaliation for Casino Unit Assignment Claim**

Retaliation under Title VII is also measured under the three-step *McDonnell Douglas* analysis. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). The district court found that although Abrams had made out a prima facie case of retaliation for his reassignment to the Casino Unit by DPS, he could not provide sufficient evidence of "temporal proximity" to prove pretext. *Abrams*, 856 F. Supp. 2d at 413.

The timing is this: within five months of Abrams filing his fourth and final CHRO Complaint in November 2009, he was reassigned to the Casino Unit by Fields, in or about May of 2010. Upon being transferred, Abrams was no longer able to do any major crime investigations, but instead was relegated to performing ministerial tasks such as background checks. Not only was Abrams's travel-time doubled from his prior work assignment, but he was no longer eligible for overtime. While "temporal proximity must be very close," *ClarkCounty Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks omitted), there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an

allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). Though five months might be enough to establish a prima facie case, temporal proximity alone is not enough to establish pretext in this Circuit. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." (internal citations omitted)). Abrams has alleged nothing beyond temporal proximity to establish pretext. Accordingly, we affirm the district court's decision to find for Defendants on the Title VII Retaliation related to Abrams's transfer to the Casino Unit.

## C. Qualified Immunity Defenses as to Individual Defendants

A decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden to demonstrate that no rational jury could conclude "(1) that the official violated a statutory or constitutional right, and (2) that the

22

right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, ––– U.S. –––, 131 S. Ct. 2074, 2080 (2011) (internal quotation marks omitted). Under prong two, a "[g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (internal alterations and quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). Finally, "we do not consider the subjective intent, motives, or beliefs of the officials." *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003) (citation omitted). "Instead, we use an objective standard for judging the actions of state and federal officials." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012).

Because the district court granted Defendants summary judgment on the § 1983 Equal Protection Clause claim, it did not reach the issue of whether Defendants are entitled to qualified immunity on that claim. In light of our decision today, which vacates the district court's dismissal of the Equal

23

Protection Clause claim and remands for further proceedings, the district court should conduct a qualified immunity analysis as to each individual Defendant on remand.

We note further that the district court erred in holding that Turner and the other individual Defendants were entitled to qualified immunity on the Title VII retaliation claim based on Abrams's continued non-placement in the Van. *Abrams*, 856 F.Supp.2d at 415-16. Since "Title VII imposes no liability on individuals, the doctrine of qualified immunity is irrelevant to plaintiff's Title VII claims." *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 829 n.3 (2d Cir. 1996) (internal citations omitted). On remand, the district court should only consider the individual Defendants' entitlement to qualified immunity with regard to the Equal Protection Clause claim brought under § 1983.

### D. Jury Verdict as to Title VII Retaliation Through Continued Non-Assignment to the Van Claim Against DPS

Abrams lastly appeals the jury verdict finding no unlawful retaliation under Title VII. Specifically, Abrams contests two rulings by Judge Charles B. Kornmann at trial: (1) the denial of Abrams's request for a continuance when Judge Kornmann moved the trial day up from the original scheduled date; and

(2) the preclusion of evidence of racial discrimination from the trial. We affirm both rulings of the district court and consequently the jury verdict as well.

The decision to deny a continuance rests within the sound discretion of the trial court and will be overturned only for an abuse of discretion. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *accord United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000). Though this action was commenced with Judge Chatigny, following the ruling on summary judgment, the remaining matter for trial was reassigned to visiting Judge Kornmann on October 4, 2012. On October 9, 2012, by way of a memorandum, Judge Kornmann advised all parties:

> This case was assigned to me for trial. I will be a visiting judge in the District of Connecticut during the weeks of December 3 and 10 and will try your case during those two weeks. . . I will start trying cases at 9:00 a.m. on Monday, December 3. I have been assigned six cases and will try the oldest case first. Thus the jury selection in 09-541, *Abrams v. Dep't of Public Safety* will be at 9:00 a.m. on December 3. Your jury will be advised instructed to report later that week to begin trial.

(Dkt. No. 98). Thereafter, on October 26, 2012, the parties filed their joint trial memorandum listing their witnesses, exhibits, stipulations of fact, proposed jury instructions and proposed verdict form.

On November 6, 2012, the Judge Kornmann issued a memorandum advising that he "will be coming there to try this case in December." (Dkt. No.

104).  On November 14, 2012, the Judge Kornmann issued another memorandum regarding three court cases, including *Abrams.*  The court stated "I want to keep you 'up to date' on what we will do.  I will arrive in Hartford at [] 2:00 pm on Friday, November 30. . . . We will select all three juries on Monday, December 3, starting at 9:00 a.m." (Dkt. No. 105).  The court then advised that the jury would be selected first in the *Abrams* case and "[t]hat jury will return for trial on Monday, December 10 at 9:00 a.m."  (Dkt. No. 105).  On Friday, November 30, 2012, counsel was apprised that the *Abrams* case would be tried a week early, starting instead on December 3, 2012, because of a late settlement in the case set to be tried first.  Abrams's counsel filed an objection to the rescheduling of the trial stating that witnesses had been subpoenaed and preparations regarding exhibits were made with the understanding that the matter would proceed on December 10th. (Dkt. No. 111-1).  On the morning of trial, Abrams moved for a continuance. (Oral Argument Tr. Dec. 3, 2012 at 6).  The district court denied the motion stating that counsel had made an attempt to address the scheduling problems. (Oral Argument Tr. Dec. 3, 2012 at 7-8).  Most significantly the district court also stated:

> And again, during the course of the trial, if you have witness problems or some other logistics, let me know, we'll try to work it in

26

as best we can. If it means starting the second trial half a day later or day later even, we'll try to accommodate you.

(Oral Argument Tr. Dec. 3, 2012 at 8). The matter proceeded to trial that same day, December 3, 2012. Abrams was called as the first witness and testified for the balance of the day and resumed the stand the morning of December 4, 2012, and testified for most of the day. The next witness called was Abrams's wife, followed by four more witnesses. At the conclusion of their testimony, Abrams rested and did not state at any time prior to resting that he had been unable to subpoena or call any witness given the change in the court's schedule.

Abrams does not point to anything in the record to suggest that he was somehow prejudiced by the scheduling of the trial and the manner in which it proceeded. Beyond the initial request for a continuance, Abrams never argued to Judge Kornmann in the course of presenting his case that he was unable to call a witness or present an exhibit. To the contrary, counsel worked cooperatively in scheduling the witnesses (Jury Trial Tr. Dec. 3, 2012 at 232) and Abrams was able to subpoena other witnesses. (Jury Trial Tr. Dec. 3, 2012 at 227). Accordingly the trial court did not err or abuse its discretion in changing the scheduling date and caused no undue prejudice. We affirm.

27

Turning to the second matter, Abrams argues that the district court erred in "exclud[ing] all evidence of racial discrimination" from Abrams's trial on retaliation, thus "anaesthetizing the jury from the very basis upon which Abrams claimed the retaliation arose." (Appellant's Br. 30). But an examination of the transcript of these evidentiary rulings makes clear that the district court did quite the opposite. (Oral Argument Tr. Dec. 3, 2012 at 11-25). In hearing arguments on the admissibility of Abrams's other discrimination claims under Fed. R. of Evid. 403, Judge Kornmann explicitly said, "[Abrams will] certainly be entitled to show that he made complaints of racial discrimination." (Oral Argument Tr. Dec. 3, 2012 at 20); later he cabined this to allow "testimony about racial matters" only to "state generally that he filed complaints . . . of discrimination." (Oral Argument Tr. Dec. 3, 2012 at 22-23).

As discussed above, to state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging him; and (3) there exists a causal connection between the protected activity and the adverse action. *Patane v. Clark*, 508 F.3d 106, 115 (2d. Cir. 2007). The district court's decision to exclude the underlying

28

evidence in support of Abrams's already-dismissed race discrimination claims, where the trial was to be held on a single retaliation claim, was not error. Rather, the district court was correct in holding that it was the evidence of Abrams's complaints of discrimination, and DPS's awareness that he had made such complaints, that were relevant and admissible in support of his retaliation claim. At trial, Abrams did exactly that, telling the jury himself that he "made a complaint, [a] discrimination complaint." (Jury Trial Tr. Dec. 3, 2012 at 94). Accordingly, we affirm the ruling of the district court.

## CONCLUSION

For the reasons given above, the order of the district court granting summary judgment to Defendants-Appellants is AFFIRMED in part regarding the casino-transfer Title VII retaliation claim; and VACATED in part, with respect to the race discrimination claims brought pursuant to Title VII and 42 U.S.C. § 1983. The jury verdict in favor of Defendants-Appellants on the remaining retaliation claim brought under Title VII is AFFIRMED. The matter is REMANDED to the district court for proceedings in accordance with this decision.

29