In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3706

KEVIN HARRIS,

*Plaintiff-Appellant,*

*v.*

WARRICK COUNTY SHERIFF'S DEPARTMENT,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:09-cv-44-RLY-WGH—**Richard L. Young**, *Chief Judge.*

ARGUED MAY 4, 2011—DECIDED JANUARY 13, 2012

Before EASTERBROOK, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The Warrick County Sheriff terminated Kevin Harris's probationary employment as a deputy sheriff based on violations of standard operating procedures, failure to follow orders, and insufficient commitment to the job. Harris sued the Sheriff's Department under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*) and 42 U.S.C. § 1981, claiming

he was fired because he is black. The district court entered summary judgment for the Department and Harris appealed.

We affirm. Harris's circumstantial evidence of discrimination falls far short of supporting an inference that he was terminated because of his race. No evidence suggests that the sheriff or other decision-makers participated in any of the alleged racially charged behavior—watching *Blazing Saddles* in the workplace and giving Harris racially tinged nicknames. Finally, although Harris identified several white deputies who were retained despite performance problems during their probationary employment, their misconduct was not comparable to his, so they cannot be considered similarly situated.

## I. Background

In November 2003 Marvin Heilman, the Sheriff of Warrick County, Indiana, hired Harris as a reserve deputy sheriff. Harris was later promoted to part-time and then full-time dispatcher, and in August 2007 became a full-time deputy sheriff. The Sheriff's Department requires all new deputies to complete a one-year probationary period learning basic law-enforcement techniques from field training officers ("FTOs"). During this period, a deputy could be discharged at the sheriff's discretion.

Not long after Harris's probationary period began, Heilman and Lieutenant Paul Weinzapfel became concerned about Harris's lack of respect for departmental policies. On one occasion Harris suspiciously took a sick

day the day after asking his FTO about sick-day procedures. Around the same time, Harris asked a sergeant whether the required minimum of 40 traffic contacts per month should be taken seriously. Harris also installed nonissue lights on his assigned patrol car and affixed a nonstandard patch on his uniform jacket, both in violation of the Department's standard operating procedures. Harris did not even read the department's standard operating procedures until Weinzapfel confronted him about these violations.

A few additional events prompted concerns about Harris's commitment to the job. Harris asked for a long-term placement at the Warrick County Judicial Center—widely regarded as a pre-retirement position—because he liked the regular hours. He also quibbled with Weinzapfel about his start time at the Judicial Center and frequently stated that he needed to attend to business at his recently opened hair salon.

In October 2007 Heilman and his command staff (Chief Deputy Brett Kruse, Weinzapfel, and Lieutenant Bob Irvin) met with Harris. Heilman expressed his disappointment with Harris's lack of motivation and apparent failure to take his job seriously. The sheriff reiterated the importance of following orders and standard operating procedures. Heilman offered to return Harris to his old job as a dispatcher if he wanted less demanding duty. Harris assured the sheriff that he was committed to being a deputy.

Harris's violation of departmental rules continued. Weinzapfel noticed Harris's patrol car parked at a local

gym, despite the fact that patrol cars were only supposed to be used for work-related purposes. Weinzapfel also discovered that Harris disobeyed a direct order to have the wiring in his patrol car checked. As a result of these violations, Weinzapfel revoked Harris's vehicle-take-home privileges for a month. Harris thereafter disobeyed another direct order by failing to make his patrol car available to transport a prisoner.

On January 4, 2008—about five months into Harris's probationary period as a deputy sheriff—Heilman and his command staff unanimously voted to terminate Harris. Heilman explained to Harris that although his performance-based deficiencies might improve with more training, the main problems were Harris's habit of disregarding orders, his casual approach to standard operating procedures, and his lack of motivation. Weinzapfel's written statement memorializing the reasons for Harris's termination is consistent with Heilman's explanation.

Both before and after Harris's termination, several white deputies had performance problems during their probationary employment but were retained. Officer Matthew Young was an unsafe driver, was not sufficiently aggressive, and did not follow the best police practices in dealing with suspects. For example, he once pulled up too closely to a dangerous suspect without cover. Officer Matthew Claridge had problems with prisoner control and traffic stops, and on one occasion almost caused an accident while talking on his cell phone while driving. Officer Dan Bullock, who replaced

Harris, struggled with decision-making skills and completing reports on time. He also had several driving accidents, on one occasion striking a suspect's vehicle. Instead of terminating these deputies, however, Heilman extended their training periods.

Harris testified in deposition to several events during his employment that he claimed were evidence of racial harassment. On one occasion detectives watched excerpts from the movie *Blazing Saddles* in his presence. Other deputies gave him racially tinged nicknames. For example, Officer Brian Wessel called him "Calvin," the name of an African-American boy in a McDonald's commercial. Officer Richard Barnett called him "Urkel," the name of an African-American character on the television show *Family Matters*. Others called him "Cowboy Troy," the nickname of an African-American country-western singer, and "Tubbs," the name of an African-American officer on the show *Miami Vice*. The only other black deputy in the Department, Officer Cory Smith, was subjected to similar nicknames.

After his probationary employment was terminated, Harris sued the Sheriff's Department under Title VII and § 1981, alleging that he was terminated because of his race. The district court granted the Department's motion for summary judgment, finding insufficient evidence of discrimination. Harris appealed.

## II. Discussion

We review the district court's grant of summary judgment de novo, construing all facts and drawing rea-

sonable inferences in favor of Harris, the nonmoving party. *Winsley v. Cook Cnty.*, 563 F.3d 598, 602 (7th Cir. 2009). Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(c).

An employee alleging racial discrimination under Title VII or § 1981 may proceed via the direct or the indirect method of proof. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849-50 & n.7 (7th Cir. 2010). Harris invoked the direct method of proof, which requires that he present "direct or circumstantial evidence that creates a convincing mosaic of discrimination on the basis of race*." Winsley*, 563 F.3d at 604 (quotation marks omitted). Harris relied on circumstantial evidence, which we have said typically falls into one of three categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).

Harris's proffered circumstantial evidence consists of (1) racially charged workplace behavior; and (2) better

treatment for similarly situated white probationary deputies.[1] In the first category are the nicknames and the workplace exposure to excerpts from *Blazing Saddles.* The argument about *Blazing Saddles* is hard to take seriously. The 1974 Mel Brooks comedy was nominated for three Academy Awards and satirizes an array of racial, ethnic, and social stereotypes. *See* WIKIPEDIA, http://en.wikipedia.org/wiki/Blazing_Saddles (last visited Jan. 5, 2012). The movie makes racism ridiculous, not acceptable, as Harris seems to contend. The nicknames are somewhat more compelling evidence of workplace racial bias. But there is no evidence that Heilman, Weinzapfel, or any others in the decision-making chain used the nicknames—or for that matter had anything to do with the viewing of film clips from *Blazing Saddles*. To prove employment discrimination, a plaintiff needs direct or circumstantial evidence "that the *decisionmaker* has acted for a prohibited reason." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). "Statements by subordinates normally are not probative of an intent to retaliate by the decisionmaker." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 351 (7th Cir. 2009) (quotation marks omitted).

In the district court, Harris loosely advanced a "cat's paw" theory of liability. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (explaining this circuit's formulation of the "cat's paw" doctrine). In

---

[1] Harris has abandoned his argument that the reasons given by the Department for his termination were pretextual.

*Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1194 (2011), the Supreme Court addressed this theory of liability, holding that an employer may be liable for employment discrimination if a nondecision-maker "performs an act motivated by [discriminatory] animus that is *intended* . . . to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action." *Id.*

On appeal Harris did not mention his "cat's paw" argument until his reply brief and even then addressed it only summarily. The argument is therefore waived. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010). We note as well that Harris has not presented evidence to support this theory of liability as the Supreme Court explained it in *Straub*. Nothing links Harris's co-workers' use of nicknames or their viewing of *Blazing Saddles* to the termination of Harris's probationary employment. *See also Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (when proceeding via the direct method, "circumstantial evidence . . . must point directly to a discriminatory reason for the employer's action").

Harris's argument that several white deputies received better treatment also suffers from a straightforward problem: There is no evidence that those deputies were similarly situated to him. "To establish that employees not in the protected class were treated more favorably, the [p]laintiff must show that those employees were similarly situated with respect to performance, qualifications and conduct." *Keri v. Bd. of Trs. of Purdue*

*Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) (quotation marks omitted). As relevant here, this inquiry does not require "near one-to-one mapping between employees," *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), but the employees receiving more lenient disciplinary treatment must at least share "a comparable set of failings," *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003).

Harris has identified several white deputies who had performance problems but were not terminated. But none of them violated standard operating procedures, disobeyed direct orders, or showed a lack of commitment to the job during their probationary periods. So they cannot be considered similarly situated to Harris. In other cases in which a minority plaintiff had some shortcomings in common with a better-treated nonminority employee but was terminated for additional, distinct performance problems, we have found the comparator employee not similarly situated. *See, e.g.*, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Moreover, there are material distinctions between Harris's misconduct and the performance problems exhibited by the white deputies. *Cf. Humphries*, 474 F.3d at 406 (where the comparator left a company safe unlocked during the day and plaintiff left it unlocked at night, the distinction between the two is merely "formalistic"). Harris was fired for insubordination and a lack of commitment, not just subpar performance; the other deputies made errors but did not disobey direct orders or manifest a cavalier attitude toward the job.

Harris insists that his mistakes were less serious than those of his comparators, whose actions sometimes put lives at risk. We have repeatedly said we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). It is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated. *See Haywood*, 323 F.3d at 530.

Finally, we briefly note that the district court did not err in drawing a nondispositive inference in favor of the Sheriff's Department based on the "same-actor" theory—that is, the theory that because the same person (here, Heilman) both hired and fired the plaintiff, it is unlikely that he had a discriminatory motive. We have explained that "the same-actor inference is unlikely to be dispositive in very many cases," but we also have approved its use as "a convenient shorthand for cases in which a plaintiff is unable to present sufficient evidence of discrimination." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 745 (7th Cir. 1999); *see also Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009) (finding that the same-actor inference can be "one more thing stacked against" a plaintiff). This is such a case.

AFFIRMED.