In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 14-2269

MICHAEL H. SIMPSON,

*Plaintiff-Appellant,*

*v.*

BEAVER DAM COMMUNITY HOSPITALS, INC.,

*Defendant-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00040-bbc — **Barbara B. Crabb**, *Judge*.

―――――――――――

ARGUED NOVEMBER 5, 2014 — DECIDED MARCH 11, 2015

―――――――――――

Before BAUER, ROVNER, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Plaintiff Michael H. Simpson, a black physician, sued Defendant Beaver Dam Community Hospital ("BDCH"), alleging that it violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by rejecting his application for medical staff privileges on the basis of his race. Simpson appeals from the district court's grant of summary judgment to BDCH. We affirm.

## I.      Background

Dr. Simpson was recruited to apply for a family medicine position at BDCH in 2010. BDCH's President and Chief Executive Officer, Kimberly Miller, made the decision to offer Simpson employment with the concurrence of BDCH's Chief Operations Officer, Mark Monson, after Simpson interviewed with them and other staff at BDCH. (Neither Miller nor Monson is a physician.) Both Miller and Monson were aware of Simpson's race when they made the employment decision. BDCH paid the recruiter $12,000 because Simpson accepted its offer of employment.

BDCH's employment offer was for a position as a family practice physician pursuant to a Physician Employment Agreement, which stated that Simpson "must apply for, obtain and maintain" active medical staff membership and clinical privileges (collectively "medical staff privileges") at BDCH. The agreement also provided that BDCH would pay Simpson a $20,000 signing bonus "within five (5) days after first day of employment." However, receipt of the bonus was contingent on Simpson's obtaining medical staff privileges and fulfilling other conditions of the employment agreement.

Dr. Simpson applied for medical staff privileges at BDCH, submitting his application to BDCH's Credentials Committee in late April 2010. His application stated that he was board certified with the American Board of Family Physicians and held an unrestricted license to practice medicine in Indiana and Illinois. It also indicated that he was a defendant in two medical malpractice cases involving wrongful death, but it did not disclose that these claims were not covered by malpractice insurance. Simpson noted that he

had received a professional sanction; he had been placed on academic probation during his first year of residency. By applying for appointment to the medical staff, Simpson expressly "authorize[d] and consent[ed] to the Hospital, its Medical Staff and their representatives to consult with Administrators and members of Medical Staffs of other hospitals with which [he has] been associated, and with others who may have information bearing on [his] competence, character and ethical qualifications."

BDCH's Credentials Committee reviews an application for medical staff privileges and makes a recommendation to the Medical Executive Committee, which then reviews the applications and makes a recommendation to the Board of Directors regarding the granting or denying of medical staff privileges. The Board of Directors makes the decision whether to grant or deny medical staff privileges.

The Bylaws of the Medical Staff of BDCH state the following with respect to applications for medical staff privileges:

> Applications for appointment to the Medical Staff will only be accepted from physicians … who (1) have unrestricted legal licenses to practice their respective profession in the State of Wisconsin … ; (2) have offices and residences located in sufficient proximity to the Hospital to be able to provide quality care to their patients at the Hospital; (3) can document their (i) background, experience, training, good judgment, and current competence, as demonstrated by peer data, references and otherwise, (ii) adhere to the ethics of their profession, (iii) have good reputation and character, including mental and emotional stability

and physical health status, according to the law, and (iv) have the ability to work harmoniously with others so that the Hospital is sure that all patients treated by them at the Hospital will receive quality care and that the Hospital and its Medical and Allied Staffs will be able to operate in an orderly manner; and (4) maintain at least the minimum professional liability insurance coverage set forth by the Hospital.

The Bylaws provide that applicants have "the burden of adequately documenting and demonstrating that their credentials meet the standards necessary to assure the Medical Staff and the Board that patients treated by them in the Hospital will be given a high quality of medical care." The Bylaws further provide that no applicant

> is entitled to appointment to the Medical Staff or to the exercise of particular clinical privileges in the Hospital solely by virtue of the fact that he/she is duly licensed to practice medicine … in Wisconsin, or any other state, or that he/she meets any written minimum criteria which may from time to time be adopted by the Board, or that he/she maintains a certification, … or is a member of any professional organization specialty body or society….

BDCH's Credentials Committee consisted of seven physicians, with one vote each. Dr. Joel Miller was the Chairman of the Credentials Committee and only voted in the event of a tie. A majority of the voting members of the Credentials Committee had to vote to grant medical staff privileges in order for the Committee to make a favorable recommendation to the Medical Executive Committee. Kimberly Miller and BDCH's Medical Staff Chief of Staff Dr. Eric Miller were

non-voting members of the Credentials Committee. The Executive Assistant to the Medical Staff, Lisa Wendlandt, also attended Credentials Committee meetings to provide administrative support. (Kimberly Miller and Drs. Eric Miller and Joel Miller are not related.)

Beginning in the spring and continuing into the summer 2010, BDCH collected information regarding Dr. Simpson's application for medical staff privileges. On September 24, 2010, the Credentials Committee met to review his application. The minutes for the meeting note:

> Members reviewed the profile for Dr. Michael Simpson. Members expressed various concerns including: the number of places practiced in the past six years, state licensing board requiring oral test, malpractice cases, and the gaps in employment.

> Members would like the following questions answered:

> Letter to Licensing Board: Ask the Wisconsin medical licensing board why Dr. Simpson was required to take orals.

> Letter to Dr. Simpson: Explain all gaps including residency and medical school, residency and board certification, and any other gaps.

> What happened with initial medical school in Illinois?

> Members asked questions regarding the interview and employment process.

According to Dr. Joel Miller, this was the first time the Credentials Committee had considered a candidate who, although licensed in other states, was required by the Wis-

consin State Medical Examining Board to take an oral exam prior to a decision on licensure. The Credentials Committee also had concerns about the two pending uninsured malpractice claims against Dr. Simpson and how they related to his ability to manage his practice and his interpersonal skills with his patients. The Committee tabled Simpson's application to obtain more information and deferred action on it until its next scheduled meeting on October 13, 2010.

Later on September 24, Dr. Simpson went to BDCH to get his $20,000 sign-on bonus check. He expressed frustration that the check was unavailable. As the district judge noted, the parties dispute whether Simpson became angry and aggressive during this encounter. Simpson asserts that he was not angry or aggressive, contending that it was a very benign meeting. But according to Kimberly Miller, Simpson was visibly upset, aggressive, and angry because his sign-on bonus was not available, and she had to calm him down. Of course, because Simpson opposes summary judgment, his description of this encounter must be credited. However, it is undisputed that Kimberly Miller's version of the encounter was discussed with Dr. Joel Miller, the Chairman of the Credentials Committee, as well as Dr. Eric Miller. (More on that later.)

After the Credentials Committee's September 24 meeting, Dr. Joel Miller requested additional information from the State of Wisconsin Division of Licensing and Regulation about Simpson's need to take an oral exam in order to be licensed to practice medicine in Wisconsin. BDCH never received a response. Simpson, however, explained that at his oral exam he just answered a few questions about his employment. Joel Miller also requested additional information

from Simpson about the gaps in his employment and educa-
tion history, the circumstances of the termination of his em-
ployment with Provena Services Corporation, and his board
certification experiences.

Dr. Joel Miller received a negative reference from a staff
member of one of Dr. Simpson's former employers regard-
ing Simpson's behavior, which was similar to what had been
reported to him about Simpson's conduct when he tried to
get his sign-on bonus. Joel Miller discussed his concern
about the negative reference with Kimberly Miller or Dr. Er-
ic Miller, or both of them. Joel Miller also expressed his con-
cerns about the two uninsured medical malpractice claims,
the need for Simpson to take an oral exam rather than being
licensed in Wisconsin without one, and the fact that Simpson
was placed on probation during his residency.

On October 12, after discussion with Kimberly Miller or
Dr. Joel Miller, or both, Dr. Eric Miller called Dr. Simpson to
give him a "heads-up" about the Credentials Committee's
concerns about his application for medical staff privileges.
Eric Miller explained to Simpson that if his application were
to be denied, it would have to be reported to the National
Practitioner Data Bank. Eric Miller outlined some of the
Committee's concerns, including Simpson's employment
and education history, the need to take an oral exam to ob-
tain licensure from the State of Wisconsin, the two malprac-
tice lawsuits, and interpersonal communications. Eric Miller
wanted to give Simpson an opportunity to withdraw his ap-
plication and avoid the risk that a denial would have to be
reported to the National Practitioner Data Bank.

After the conversation with Dr. Eric Miller, Dr. Simpson e-mailed the executive assistant to the medical staff as follows:

To Whom It Concerns,

I have decided to withdraw my application for employment at [BDCH]. At this time, it is in my best interest to pursue other employment opportunities. I wish BDCH well in its search for a physician to meet its needs.

Best Regards,

Michael H. Simpson, MD

On October 13, the Credentials Committee met and closed Dr. Simpson's application without making any decision on it. As a result, the Medical Executive Committee never reviewed Simpson's application and the Board of Directors never decided whether to grant or deny him medical staff privileges.

At his deposition, Dr. Simpson testified that during their October 12 telephone conversation Dr. Eric Miller accused him of "disruptive behavior," referring to his interaction with Kimberly Miller when he attempted to get his sign-on bonus. Eric Miller told Simpson that he would have expected an applicant to be on his "best behavior" and more "collegial" during the pendency of his application for medical staff privileges. Simpson suggested that BDCH hire him on a probationary status to see how he would do if Eric Miller was concerned that he was disruptive. Eric Miller responded that they had had some "bad actors" in the past, and it was easier not to hire a bad actor than to get rid of

one. Simpson also stated that Eric Miller said he wished
Simpson well in finding a position that was a "better fit."
Simpson believes that the "best behavior," "bad actor" and
"better fit" comments were race based and direct evidence of
discriminatory intent.

BDCH moved for summary judgment on Simpson's race
discrimination claims. The district court determined that
"[n]o reasonable jury could conclude that defendant failed to
grant plaintiff medical staff privileges because of his race;
rather, the uncontradicted evidence shows that defendant
was not going to move forward with plaintiff's application
for staff privileges because of legitimate concerns about
plaintiff's past performance, judgment and behavior" and
granted BDCH's motion. *Simpson v. Beaver Dam Cmty. Hosp.,
Inc.*, No. 13-cv-40-bbc, 2014 WL 1875336, at *1 (W.D. Wis.
May 9, 2014). Simpson appealed.

## II.    Discussion

We review the grant of summary judgment de novo, con-
struing the record in the light most favorable to the non-
movant and drawing all reasonable inferences in his favor.
*See, e.g., Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444,
447 (7th Cir. 2012). Summary judgment is appropriate when
there is no genuine issue of material fact and the moving
party is entitled to judgment as a matter of law. *Id.*

Dr. Simpson argues that summary judgment is inappro-
priate in cases such as this where intent, good faith, and oth-
er subjective feelings are at issue, citing *McGreal v. Ostrov*,
368 F.3d 657, 677 (7th Cir. 2004). He is incorrect:

> Language in some of our cases implies that because
> intent is a critical issue in employment discrimination

cases, summary judgment is unlikely to be appropriate in such cases. But as there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases, what the language … really means is just that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be.

*Wallace v. SMC Pneumatics, Inc.* 103 F.3d 1394, 1396 (7th Cir. 1997) (citations omitted); *see also Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) ("Although intent and credibility are often critical issues in employment discrimination cases, no special summary judgment standard applies to such cases."). Summary judgment may be appropriate if the plaintiff "fails to produce evidence of a motive or intent that would support [his] position." *Cliff v. Bd. of Sch. Comm'rs of Indianapolis, Ind.*, 42 F.3d 403, 409 (7th Cir. 1994).

Although serious questions have been raised about the continuing utility of analyzing discrimination claims through the "direct" and "indirect" methods of proof, *see, e.g.*, *Coleman v. Donahue*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring), litigants and courts still properly discuss racial discrimination claims under Title VII and § 1981 using the language of either the direct or indirect method of proof, *Harris*, 666 F.3d at 447. All relevant evidence is considered together under both methods, yet we still consider the two methods separately when reviewing a grant of summary judgment. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). The ultimate question is "whether a reasona-

ble jury could find prohibited discrimination." *Id.* (quotation marks omitted)

Under the direct method, a plaintiff must produce direct or circumstantial evidence of intentional racial discrimination. *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014). Direct evidence requires an admission of discriminatory intent, whereas "circumstantial evidence typically includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* "Circumstantial evidence must point directly to a discriminatory reason for the employer's action." *Mullin v. Temco Mach., Inc.* 732 F.3d 772, 777 (7th Cir. 2013) (internal quotation marks omitted). To avoid summary judgment, a plaintiff must present sufficient evidence from which a reasonable jury could find that the employer took an adverse action against him because he is a member of a protected class. *Id.*

Under the indirect method of proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff in a case such as this, which is analogous to a failure-to-hire case, has the burden of establishing a prima facie case of racial discrimination by showing that: (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected (in other words, he suffered an adverse employment action); and (4) the position remained open and the employer continued to

seek applicants from persons of similar qualifications. *Id.* at 801–02; *see Norman-Nunnery v. Madison Area Tech. College,* 625 F.3d 422, 431 (7th Cir. 2010). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer offers such a reason, the burden reverts to the plaintiff who must show that the stated reason is a pretext, which raises a reasonable inference of unlawful discrimination. *Id.* at 804.

We agree that Dr. Simpson suffered an adverse employment action. To establish an adverse employment action, "a 'plaintiff must show that a reasonable employee would have found the challenged action materially adverse.'" *Hicks v. Forest Preserve Dist.*, 677 F.3d 781, 787 (7th Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). A reasonable physician would have found the threat that his application for privileges would be rejected and that the rejection would have to be reported to the National Practitioner Data Bank to have been materially adverse. While an applicant who voluntarily withdraws an application cannot state a prima facie case of discrimination, *see Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 762–63 (4th Cir. 1998), *rev'd on other grounds*, 527 U.S. 1031 (1999), Dr. Eric Miller's warning indicated that it would be futile for Simpson to maintain his application. The writing was on the wall. In essence, viewing the facts in the light most favorable to Simpson, he was compelled to withdraw his application for privileges before the Credentials Committee voted on it; thus the withdrawal does not undermine his prima facie case. *See id.*

Dr. Simpson argues that he offered sufficient direct evidence of race discrimination. First, he points to Dr. Eric Mil-

ler's comments about Simpson being a "bad actor," who was not on his "best behavior," and who would be a "better fit" elsewhere. Second, Simpson relies on the evidence that BDCH granted medical privileges to three white family medicine physicians. Third, Simpson asserts that he was qualified for the family medicine position, which he claims indicates that BDCH's decision to reject his application was pretextual.

Dr. Eric Miller's comments to Dr. Simpson that he was a "bad actor," was not on his "best behavior," and would be a "better fit" elsewhere do not address race, do not refer to Simpson's race, and do not hint at racial animus. In order to suffice as direct evidence of discrimination, the comments must suggest that the decisionmaker "was animated by an illegal employment criterion" or had "a propensity … to evaluate employees based on illegal criteria." *Venters v. City of Delphi*, 123 F.3d 956, 972–73 (7th Cir. 1997); *see also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (concluding that the employer's remark must at least reflect illegal motivation). Eric Miller's comments in no way suggest that he or the Credentials Committee had concerns about Simpson's qualifications because of his race.

Nor do the comments reasonably suggest that Dr. Eric Miller or the Credentials Committee was motivated by racial animus. Dr. Simpson asserts that the "better fit" comment "*just might* have been about race," and thus even in isolation could raise a triable issue of fact. At the summary judgment stage, however, circumstantial evidence of discrimination "must point 'directly to the conclusion that an employer was illegally motivated, without reliance on speculation.'" *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 800 (7th Cir.

2014) (quoting *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012)); *see also Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (stating that a nonmoving party is entitled "to all reasonable inferences in her favor" but "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"). In the context of this case, the "better fit" comment does not raise an inference of illegal motivation without reliance on sheer speculation.

Comments such as "better fit" or "fitting in" are not necessarily about race or discriminatory. As BDCH observes, we and other courts have used the phrase "better fit" in describing legitimate, nondiscriminatory reasons for a hiring decision adverse to the plaintiff. *See, e.g.*, *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999) (concluding that the employer articulated a legitimate, nondiscriminatory reason for its hiring decision where it "aver[red] that [another applicant] had clearly superior qualifications to [the plaintiff], and was a better fit for the position …."); *see also Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 600 (6th Cir. 2014) (concluding that university offered a legitimate, nondiscriminatory reason for its rejection of plaintiff's application for Ph.D. program in psychology where it stated that plaintiff was "a better fit" for the counseling program); *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740 (7th Cir. 2010) (noting that plaintiff was told he was losing his job "because he did not fit in"). And we have rejected the notion that the use of "better fit" language must be a pretext for unlawful discrimination. *See Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("The fact that [the employer] … attempt[ed] to find individuals who did not present [the] negative attributes

[held by plaintiffs] and were a better fit for the position does not show pretext.").

Dr. Simpson cites two cases to support his view that the use of language such as "better fit" or "fitting in" might have been about race and creates a triable issue of fact, but his reliance is misplaced. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244 (2d Cir. 2014); *Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004). In *Abrams*, the plaintiff, an African-American police detective in a major crimes unit, applied for a position in a specialized unit that handled homicides known as the "Van." Seniority was a factor in the selection of candidates for the Van; a college degree was not a requirement for the position. While in the major crimes unit, the plaintiff was "one of no more than three black detectives" and was the only one to ever express interest in the Van. *Abrams*, 764 F.3d at 247–49. During the relevant time period, the eight detectives selected for the Van were white. Some of them had a college degree, whereas the plaintiff did not; however, he had more training and seniority than each of the detectives chosen over him. *Id.* at 249. When a position in the Van became available in 2007, the plaintiff's supervisor recommended him for it, rating him "superior" in every category and noting that his reports were "fantastic." *Id.* Despite the recommendation, the captain found another applicant would "fit in better" with or be a "better fit" for the Van. *Id.* The supervisor testified that it had "crossed his mind" that the "better fit" statement could be related to race. *Id.* In fact, similar words had been used before by another person involved in selecting applicants for the Van to explain the plaintiff's continued rejection: a detective who was a member of the Van explained that he "did not fit in." *Id.*

The *Abrams* court concluded that the "better fit" statement raised a reasonable inference of discrimination. *Id.* at 253. In doing so, it applied the reasoning of *Patrick v. Ridge*:

[T]he explanation given by the [employer], i.e., that [employee] was not "sufficiently suited" for the position—even including [supervisor's] belief that she would not "fit in"—does not necessarily qualify as a "nondiscriminatory" reason. After all, a hiring official's subjective belief that an individual would not "fit in" or was "not sufficiently suited" for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent: The employer just might have found the candidate "not sufficiently suited" *because of* a protected trait such as age, race, or engaging in a protected activity. We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement, such as that a candidate is not "sufficiently suited" for the position, is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas*. It is, at bottom, a non-reason.

*Abrams*, 764 F.3d at 253 (quoting *Patrick*, 394 F.3d at 317).

Both *Patrick* and *Abrams* were decided on summary judgment; thus the courts were construing the facts in the light most favorable to the nonmoving party, the plaintiffs. And the courts' conclusions about what the "fit in" statements could mean were made in the factual contexts presented in those cases. In *Abrams*, although the plaintiff was more qualified than the other applicants with regard to at least one selection criteria (seniority), and was highly recommended, he was not selected. And the defendants' prof-

fered reasons for not selecting the plaintiff were "questionable": the defendants cited the plaintiff's "poor writing reviews" and lack of a college education, but the reviews came "largely from his time in police training many years earlier" and more than one-third of those chosen for the Van lacked a college education. *Id.* at 254. Considering all the evidence, including the "better fit" and "fitting in" statements, the court described the case as "very close" and decided that there was enough to create a question of fact for a jury as to pretext. *Id.*

In *Patrick*, the plaintiff, a contracting officer and realty specialist for the INS, repeatedly sought a promotion to a supervisory position. The first time she was passed over in favor of someone who was more than ten years her junior. The second time the plaintiff applied for the supervisory position, she had more than twelve years' experience as a realty specialist and had served as acting supervisor on several occasions. The final decisionmaker selected an outside candidate, explaining that she was the "best qualified" for the position. 394 F.3d at 314. The INS stated that the plaintiff was not promoted because she was not "sufficiently suited" for the supervisory position. *Id.* at 316. However, no evidence in the record clarified or expanded on that statement other than the decisionmaker's "statement that he evaluated candidates based not only on work credentials and experience but also on how he thought that the candidate would fit into the work group." *Id.* The INS failed to explain what that statement meant and failed to produce any "specifics for why [the plaintiff] would not fit in with the group." *Id.*

The court held that the INS's assertion that the plaintiff was not "sufficiently suited for the position" was not suffi-

ciently specific to meet its burden of stating a legitimate, nondiscriminatory reason for its employment action: it was "a non-reason." *Id.* at 317. The court reasoned that had the INS stated that the plaintiff "was not 'sufficiently suited' to fill the [supervisory] position because of her experience, credentials, attitude, or some other such articulable characteristic, the agency's reason might have provided enough detail to enable [the plaintiff] to attempt to show pretext." However, given the "bald and amorphous statement that [the plaintiff] was 'not sufficiently suited,'" the plaintiff could not attempt to demonstrate pretext. *Id.*

This case is unlike *Patrick*, where the defendants offered a nonspecific and unexplained reason for the employment decision—simply that the plaintiff was "not sufficiently suited" for the position. BDCH has articulated clear, specific, and detailed concerns over Dr. Simpson's application for medical staff privileges. Several of the concerns were documented in the Credentials Committee's September 24 meeting notes and corroborated by the Committee's requests for additional information from Simpson and the state licensing board. And Dr. Eric Miller discussed many of the concerns with Simpson when Miller called Simpson to give him a "heads-up" about the Committee's concerns. This case also is unlike *Abrams* where there was sufficient evidence other than the "fit in" comments to permit a reasonable inference that the comments were a reference to the plaintiff's race.

Dr. Simpson may believe that the "best behavior," "bad actor," and "better fit" comments were race based and direct evidence of discriminatory intent. Nonetheless, a plaintiff's subjective beliefs "are insufficient to create a genuine issue of material fact." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir.

2012) (quotation marks omitted); *see Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) ("[Plaintiff's] belief that [his manager] was implicitly complaining about the affirmative action policy when he uttered the remark [that the plaintiff had been 'screwed' when a white woman was promoted instead of him] is too conjectural to serve as evidence of race or gender discrimination."). No reasonable juror could find that Dr. Eric Miller's comments were evidence of race discrimination.

In addition, the fact that BDCH granted medical staff privileges to three white family physicians after threatening to reject Dr. Simpson's application is not direct evidence of racial discrimination. Simpson argues that under the direct method of proof, he need not show pretext or that similarly situated employees outside the protected class were treated better. That may be so. But contrary to what Simpson seems to think, we have not held that a finding of intentional discrimination may be established under the direct method merely with evidence that a person outside the protected class was treated better than the plaintiff or that the employer sought a replacement for the plaintiff. The authorities cited by Simpson address the indirect method rather than the direct method of proof. *See, e.g.*, *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 820 (7th Cir. 2006) ("Here, the plaintiffs did not present direct or circumstantial evidence of discrimination.").

Dr. Simpson argues that he was qualified for the family medicine position, which he maintains shows that BDCH's decision to reject his application for medical staff privileges was pretextual. BDCH responds that it had legitimate, non-discriminatory concerns about Simpson's application be-

cause of the following: (1) his need to sit for an oral exam to obtain a Wisconsin medical license, (2) his placement on academic probation while in residency, (3) two uninsured medical malpractice claims, and (4) a negative reference received by Dr. Joel Miller from a staff member of one of Simpson's former employers regarding Simpson's behavior. (The former employer was not Dr. Abdus Lakhani whom Simpson had requested BDCH refrain from contacting.)

In addressing these concerns, Dr. Simpson challenges BDCH's right to rely on the self-serving, subjective opinions of Kimberly Miller, Dr. Eric Miller, and Dr. Joel Miller, regarding his qualifications. Disputing their subjective opinions is not enough by itself. We have noted that reliance "on subjective factors is not *per se* illegal," *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992); however, under certain circumstances, an employer's subjective reason for an employment decision may be reasonably viewed as a pretext for discrimination, *id.* at 427–28 (employer's subjective judgment about employee's interpersonal skills was contradicted by objective evidence); *Perfetti v. First Nat'l Bank of Chi.*, 950 F.2d 449, 457–58 (7th Cir. 1991) (holding employee failed to demonstrate that employer's stated reason for not rehiring him—his interpersonal skills–was pretext).

According to Dr. Simpson, because he was qualified for the family medicine position, BDCH's concerns must have been pretexts for race discrimination. The Medical Staff Bylaws articulated four minimum criteria for acceptance of an application for appointment. While Simpson may have submitted the materials and information necessary to complete the medical staff credentialing checklist, and he did obtain an unrestricted legal license to practice medicine in the State

of Wisconsin, there were other criteria that an applicant had to satisfy in order to obtain medical staff privileges. These other criteria included documenting one's "background, experience, training, good judgment, and current competence, as demonstrated by peer data, references and otherwise"; adhering to professional ethics; having a good reputation and character as well as "the ability to work harmoniously with others" to ensure quality patient care and to ensure that the hospital "will be able to operate in an orderly manner."

Besides, the Bylaws expressly provide that no applicant for medical staff privileges "is entitled to appointment to the Medical Staff or to the exercise of particular clinical privileges in the Hospital solely by virtue of the fact that he/she is duly licensed to practice medicine … in Wisconsin, or any other state, or that he/she meets any written minimum criteria which may from time to time be adopted by the Board …." Thus the Bylaws themselves refute Simpson's position that he satisfied the criteria for obtaining medical staff privileges simply by submitting required documentation and obtaining an unrestricted medical license in Wisconsin. Moreover, the Bylaws also state that an applicant has "the burden of adequately documenting and demonstrating that [his] credentials meet the standards necessary to assure the Medical Staff and the Board that patients treated by [him] in the Hospital will be given a high quality of medical care." In the Credentials Committee's view, given their concerns about Simpson, Simpson failed to carry this burden.

Dr. Simpson offered no evidence to raise a reasonable inference that the Credentials Committee did not honestly have concerns about his application. "[W]hen an employer articulates a plausible, legal reason for [its action], it is not

our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [its action]." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 738 (7th Cir. 2011) (quotation marks omitted). Simpson offered explanations in response to the concerns, and while those explanations may have relieved any cause for concern in his eyes, it is the Credentials Committee's assessment of his application that matters.

The sincerity of the Credentials Committee's concern over his need to take an oral exam to obtain his license, Dr. Simpson argues, "is undercut by the reasonableness of the belief." We have said that the "determination of whether a belief is honest is often conflated with analysis of reasonableness; the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) (quotation marks and citation omitted). Yet we have also said that "'[a]n inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness.'" *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014) (quoting *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013)). "[T]he 'question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain [its decision].'" *Id.* (quoting *Coleman*, 667 F.3d at 852).

The concern over Simpson's need to sit for an oral exam, where this was the first time the Credentials Committee had considered a candidate who was licensed in other states yet was required to sit for an oral exam, was reasonable. Simpson's report to BDCH that the oral exam consisted of a few

questions about his education and employment background does not relieve the Committee's concerns as to why the Medical Licensing Board required him to sit for an oral exam. Simpson has not raised a reasonable inference that the concern was not honestly held.

Dr. Simpson challenges the Credentials Committee's concern about the negative reference Dr. Joel Miller received from an anonymous staff member of one of Simpson's former employers on several grounds. First, he argues that the negative reference is inadmissible hearsay. However, the reference was considered not for its truth, but to show its effect on the state of mind of the hearer, Joel Miller, and other Credentials Committee members. Thus it was not inadmissible hearsay. *See, e.g.*, *United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something."); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.")

Next, Dr. Simpson claims that BDCH's reliance on this one negative reference is pretextual because BDCH had received several positive references for him and had conducted background checks on him. The positive recommendations do not nullify the validity of the negative reference; nor do they raise a reasonable inference that the Credentials Committee could not have honestly had a concern about the negative reference. Simpson says he was willing to meet with the Committee to answer any questions and provide more information. But nothing obligated the Committee to

take him up on his offer. The Committee did not typically have applicants for initial privileges attend its meetings. *See* Supplemental Declaration of Dr. Joel D. Miller ¶ 7 ("BDCH's Credentials Committee does not typically invite applicants for initial privileges to attend its meeting. However, Dr. Simpson, in accordance with BDCH's By-Laws, would have had a right to appeal a denial of his medical staff privileges at which time he would have had the opportunity to appear at a hearing.").

Dr. Simpson asserts that he had requested BDCH not to contact two of his former employers. That by itself might raise some flags in a potential employer's eyes. Simpson complains that BDCH conducted its inquiry without giving him any warning. Yet his application for appointment to medical staff expressly "authorize[d] and consent[ed] to the Hospital, its Medical Staff and their representatives to con-sult with Administrators and members of Medical Staffs of other hospitals with which [he has] been associated, and with others who may have information bearing on [his] competence, character and ethical qualifications." Further-more, while an employer may reasonably choose *not* to reject an applicant on the basis of one negative reference, nothing requires an employer to ignore such a reference—even if all other reported information is positive (and here it was not given the bases for the Credentials Committee's other con-cerns about Simpson's application).

As for the two medical malpractice claims, Dr. Simpson argues that BDCH's reliance on them as a reason to reject his application is pretextual because BDCH knew about them from his very first contact with BDCH. That the non-physicians involved in the decision to offer Simpson em-

ployment knew about the lawsuits is one thing; the Credentials Committee's concern about the lawsuits is another. There is evidence in the record that at BDCH offers of employment and the granting of medical staff privileges are based on different criteria and performed by different decisionmakers. The medical malpractice claims could be a legitimate concern despite BDCH's knowledge of them at the time it made its offer of employment. More importantly, Simpson's early contacts with BDCH did not disclose that the claims were uninsured; BDCH discovered that later in the credentialing process. It is undisputed that the Credentials Committee had a concern over how the two uninsured malpractice claims reflected on Simpson's ability to manage his practice and his interpersonal skills with patients.

Like the malpractice claims, the fact that BDCH was aware in April 2010 that Dr. Simpson had been placed on academic probation does not refute the fact that the Credentials Committee had concerns about it. Placement on academic probation is not an accolade. Simpson submits that his placement on academic probation the first year of his residency has no bearing on his current competency as a physician. Some may hold that view. Nonetheless, reasonable minds could view the academic probation as a concern, and the Credentials Committee did. In fact, Simpson's follow-up letter to BDCH disclosed that he was placed on academic probation during his residency *and* he received a poor evaluation for an inpatient medicine rotation.

As noted, the parties dispute whether Dr. Simpson became angry and aggressive when he attempted to collect his sign-on bonus check. BDCH maintains that Simpson was aggressive and angry and insisted that he be given his check,

whereas Simpson states that he was not abusive, hostile, or aggressive and did not demand the check. Because we are reviewing the district court's grant of summary judgment, we of course accept Simpson's view of the incident. Nonetheless, Simpson does not dispute that his conduct *as described to Dr. Joel Miller* was similar to the behavior described in the negative reference that Joel Miller received.

It is not enough for Simpson to demonstrate that Joel Miller was wrong to think that his conduct was similar to the behavior described in the negative reference. Simpson has to raise a genuine issue about the honesty, not the accuracy, of Joel Miller's belief on that point. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) (indicating that the court's concern is not whether "an employer may be wrong about its employee's performance" but rather whether the employer offers a pretext for illegal discrimination); *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002) ("[I]n determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers."). Simpson has not pointed to any evidence to suggest that Joel Miller did not honestly believe that Simpson's conduct was similar to the behavior reported in the negative job reference. Nor has he identified any evidence that would suggest that Dr. Eric Miller did not honestly believe that Simpson engaged in disruptive behavior when interacting with Kimberly Miller.

Furthermore, Dr. Simpson does not advance a "cat's paw" theory of liability, arguing that Kimberly Miller was intentionally influencing the Credentials Committee to make

a discriminatory decision against him. Under this theory, an employer can be held liable "where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014) (citing *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012)). To prevail under such a theory, Simpson would have to demonstrate that Kimberly Miller, who was involved in the initial decision to extend an offer to him, was motivated by discriminatory animus and falsely reported his behavior to either Dr. Joel Miller or Dr. Eric Miller, or both. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 604 (7th Cir. 2014); *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013). However, Simpson points to no evidence suggesting that Kimberly Miller was motivated by discriminatory animus because of his race, "and we are not required to draw inferences that, 'are supported by only speculation [or] conjecture.'" *Johnson*, 726 F.3d at 915 (quoting *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013)). Therefore, Simpson could not succeed under the cat's paw theory even if he had asserted it.

Moreover, to the extent BDCH relied on Dr. Simpson's alleged conduct on September 24, the alleged conduct was only one of its many concerns. BDCH has identified several concerns with Simpson's application for medical staff privileges. Simpson would have to raise an issue as to pretext for each proffered concern to withstand summary judgment. *See Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 659 (7th Cir. 2009) ("[W]hen a defendant has offered multiple nondiscriminatory reasons for its hiring decision, showing that one of these reasons is pretextual is not enough ....") (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). Although we

have noted that "there may be circumstances where 'multiple grounds offered by the defendant … are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment," *Fischer*, 519 F.3d at 404 (internal quotation marks omitted), this case does not present such circumstances. Even if Dr. Joel Miller and other members of the Credentials Committee incorrectly believed that Simpson's behavior on September 24 substantiated the negative reference Joel Miller received, the Committee had other legitimate concerns about Simpson's application, and Simpson has not raised an issue as to whether any of those other concerns were pretextual.

Having considered the record, we conclude that Dr. Simpson has no case of racial discrimination under the direct method of proof. Even when all of his evidence is cobbled together, no reasonable jury could find that BDCH had concerns about Simpson's application for medical privileges because of his race.

As for the indirect method, even if we assume that Dr. Simpson can establish a prima face case of race discrimination, Simpson cannot prevail because BDCH proffered legitimate, nondiscriminatory reasons for its employment action—the Credentials Committee's concerns about his qualifications. Simpson argues that he has presented evidence that BDCH's stated reasons are pretexts because "he fulfilled all the objective qualifications set forth in [BDCH]'s by-laws but was still" rejected. This argument reveals confusion about how pretext is established. Simpson has not refuted the facts which underlie the Credentials Committee's concerns about his qualifications. Had he refuted the underlying facts, he would have raised an inference that the Credentials

Committee "may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994). But rather than refuting the facts that underlie the concerns, Simpson simply argues that the concerns should not have mattered. *See, e.g.*, Appellant's Br. 40 (asserting that "Plaintiffs placement on academic probation bore no impact in assessing his current medical competency…."). That is his view, but the Credentials Committee is entitled to its own view, provided it is not based on an impermissible animus such as race. And the record does not raise a reasonable inference that it was.

Simpson has failed to show that any of the Credentials Committee's concerns were untrue, unreasonable, or pretexts for discrimination. Therefore, his claims fail under the indirect method of proof as well.

## III. Conclusion

The district court's judgment in favor of BDCH is AFFIRMED.